[Cite as *State v. Hicks*, 2015-Ohio-4978.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 102206**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ANTONIO R. HICKS

DEFENDANT-APPELLANT

**JUDGMENT:**
REVERSED AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-581201-A

**BEFORE:** E.A. Gallagher, J., Celebrezze, A.J., and Jones, J.

**RELEASED AND JOURNALIZED:** December 3, 2015

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1360 East 9th St.
Suite 600
Cleveland, Ohio 44114

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY: Glen Ramdhan
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN A. GALLAGHER, J.:

{¶1} Defendant-appellant Antonio R. Hicks appeals his conviction for aggravated murder and the imposition of consecutive sentences on his convictions for aggravated murder and having weapons while under disability. Hicks contends that his conviction for aggravated murder should be overturned because there was insufficient evidence to prove the element of prior calculation and design beyond a reasonable doubt and that the jury's finding that the state had proved that element was against the manifest weight of the evidence. He also contends that the trial court erred by failing to include findings in its sentencing journal entry supporting the imposition of consecutive sentences for his aggravated murder and having weapons while under disability convictions. For the reasons that follow, we vacate Hicks' aggravated murder conviction and sentence and remand the matter for resentencing.

**Factual and Procedural Background**

{¶2} On December 30, 3013, a Cuyahoga County Grand Jury indicted Hicks on seven counts: aggravated murder under R.C. 2903.01(A), purposely causing death with prior calculation and design (Count 1); aggravated murder under R.C. 2903.01(B), purposely causing death during the commission or attempted commission of kidnapping (Count 2); kidnapping under R.C. 2905.01(A)(3) (Count 3); murder under R.C. 2903.02(B) (Count 4); felonious assault under R.C. 2903.11(A)(2) (Count 5); having weapons while under disability under R.C. 2923.13(A)(2) (Count 6); and grand theft under

R.C. 2913.02(A)(1) (Count 7). All of the counts contained one- and three-year firearm specifications. The kidnapping and felonious assault counts also contained a notice of prior conviction and a repeat violent offender specification. Hicks pled not guilty and the case proceeded to trial. Hicks waived a jury trial on the having weapons while under disability count, the notice of prior conviction and the repeat violent offender specification. The remaining counts were tried before a jury.

{¶3} At trial, the state presented testimony from 28 witnesses and offered nearly 200 exhibits into evidence. A summary of the evidence pertinent to the issues raised in Hicks' appeal follows.

{¶4} On the evening of December 20, 2013, Hicks and his wife, Diana Fields-Edmonds, were scheduled to go out on a "date night." Kecia Johnson, Fields-Edmonds' best friend, testified that she and Fields-Edmonds had been exchanging texts about the couple's plans for the evening earlier that day. Hicks and Fields-Edmonds had had some marital difficulties and Hicks had recently returned home after staying at his father's house and enjoying "female company" for three weeks. Allegedly, this was not the first time Hicks and Fields-Edmonds had issues with their marriage. Ashi Robinson, Fields-Edmonds' "God sister" testified that although Fields-Edmonds and Hicks generally had a "loving and caring relationship, especially when they first got married, * * * [o]n one occasion it turned to something different." She testified that in April 2013, she saw Fields-Edmonds with a black eye that Robinson attributed to Hicks.

{¶5} Before the couple went out for their "date night," Fields-Edmonds styled the hair of Janeese Williams, a friend from church. Williams testified that she had a 7:00 p.m. appointment at Fields-Edmonds' home. Hicks was not home when Williams arrived. Williams testified that when Hicks came home, he greeted the women and went upstairs. While Fields-Edmonds was styling Williams' hair in the living room, she and Williams spoke about the issues Fields-Edmonds and Hicks were having with their marriage. Williams testified that Hicks must have overheard their conversation because "he had like an outburst" and yelled down from the upstairs bathroom, "I hear that s* * * you talking, b * * * *. I don't have to be here, I can leave if you want me to." Williams stated that although she could not see Hicks, he sounded angry and that she "had never heard him that loud before." Williams testified that after his initial "outburst," she could hear him upstairs "still talking about it," telling Fields-Edmonds that "if she couldn't forget what had happened, leave that s * * * alone, you know, he could be gone in a second, you know, he didn't have to stay there."

{¶6} When Williams' hair was finished — sometime between 10:00 and 10:30 p.m. — Hicks came downstairs. Williams testified that she asked Hicks if he was alright. Hicks replied, "yeah, I'm cool." Although he did not smile or laugh or "anything like that," Williams stated that she thought "he was okay." She stated that she did not hear any further discussions between Hicks and Fields-Edmonds.

{¶7} Williams then went outside to her car. Hicks' pickup truck was the first vehicle in the driveway and had been backed into the driveway. Williams' car was the

second car in the driveway, and Fields-Edmonds' car was behind hers, blocking her in. Williams sat in her vehicle and waited for someone to move Fields-Edmonds' vehicle so she could leave. Hicks came out of the house first. He sat in Fields-Edmonds' car for a few minutes, then got out and went over to his truck. Williams testified that she saw Hicks open the driver-side door and bend over, reaching for something under the driver-side seat. When he stood up, Williams saw Hicks place something in his waistband and cover it with his jacket. Williams did not see what it was. She testified that, that night, she did not think it was a gun. However, after she learned that Fields-Edmonds had been shot and killed, she "thought that's probably what he got out of the car * * * he probably was getting a gun out of the car when I seen him."

{¶8} Shortly thereafter, Fields-Edmonds came out of the house, got into the car with Hicks and backed out of the driveway so Williams could leave. Looking in her rearview mirror, Williams saw Fields-Edmonds' vehicle behind her vehicle as she traveled down East123rd Street towards Union Avenue until Williams made a right turn at East 106th Street and Union Avenue to go home. Williams stated that she arrived home at 10:30 p.m. and that the drive from Fields-Edmonds' house to Williams' house was "not even five minutes."

{¶9} Detective Arthur Echols, one of the homicide detectives who investigated the incident, testified that based on a contemporaneous Facebook posting by Fields-Edmonds, he learned that Fields-Edmonds and Hicks had been at the Cloverleaf bowling alley playing pool sometime later that evening. Patrol Officer Kenneth Allen, one of the

responding officers, testified that Maria Brown, who belonged to the same motorcycle club as Fields-Edmonds, informed him that Fields-Edmonds and Hicks had been arguing at the Cloverleaf. Brown testified at trial; however, she was not asked about any alleged argument between the couple at the Cloverleaf. Moreover, it does not appear that Brown was at Cloverleaf that evening. Brown testified that she "went out" at about 8:00 p.m. and spent the evening at the Fly High and the Kitchen.

{¶10} Lisa Scott, a cousin of Fields-Edmonds by marriage, testified that sometime between 11:00 p.m. and 12:30 a.m., she and a friend, Twilla Reynolds, went to the Wolf's Den, a bar located on the corner of East 83rd Street and Cedar Avenue in Cleveland. Scott testified that when they entered the bar, she saw Fields-Edmonds sitting in "her particular spot where she always sit" and had a brief, casual conversation with her. At approximately 2:30 a.m. — "closing time" — as Scott and Reynolds were walking out the back door of the bar to the parking lot, Scott saw Fields-Edmonds leaving the bar with a man wearing dark jeans or slacks, a dark jacket and a cap. Scott later identified the man she saw with Fields-Edmonds in a photo lineup and in court as Hicks. Scott testified that as she walked past Fields-Edmonds, she told her twice to "be careful." Scott could not explain why she told Fields-Edmonds to "be careful." She acknowledged it was not a "normal thing" she would say to Fields-Edmonds; "it just came out of nowhere." Fields-Edmonds said, "okay, cuz" and got into her car. Scott testified that after Fields-Edmonds got into her car, Hicks stood outside her driver-side door, talking to her.

{¶11} Reynolds offered similar testimony. She testified that she and Scott arrived at the Wolf's Den at around 11:00 p.m. or 11:30 p.m. on December 20, 2013, and that she saw Fields-Edmonds dancing with a guy on the dance floor. Although Reynolds recognized Fields-Edmonds because she "used to see her in the bar every now and then," they were not friends. Reynolds testified that she and Scott exited the bar at around 2:00 a.m. "right before the bar closed." As they were walking toward Reynolds' car in the parking lot, Reynolds saw Fields-Edmonds talking to the man with whom she had been dancing. Reynolds testified that Scott "hollered" at Fields-Edmonds and told her to "be careful."

{¶12} Scott and Reynolds got into Reynolds' car and were preparing to leave the Wolf's Den when another of their friends, Malika, pulled up in her vehicle. Scott testified that she and Reynolds got out of the car and went back inside the bar to talk to Malika for "a good five minutes." Reynolds similarly testified that she "hollered at" Malika "for about five minutes." As the women prepared to leave the bar a second time, Scott noticed that Fields-Edmonds' vehicle was gone.

{¶13} Reynolds turned out of the Wolf's Den parking lot and drove down East 83rd Street towards Woodland Avenue. As Reynolds' vehicle approached the intersection of East 83rd Street and Woodland Avenue, the women observed a car, later identified as Fields-Edmonds' vehicle, off to the right side of the road. Scott testified that she saw a man wearing a beige jacket walk from the passenger side of the vehicle to the driver side of the vehicle, hesitate and then go back to the passenger side of the vehicle. Scott

testified that as the man in the beige jacket was getting into the passenger side of the vehicle, the car lights came on, the driver-side door opened and she saw what appeared to be someone throwing a bag of garbage or clothes out of the car. Reynolds also saw what had happened but observed that it was actually a body that had been pushed out of the vehicle. Scott testified that she was unable to see the man's face and could not say whether it was the same man she had seen Fields-Edmonds speaking with as the women left the Wolf's Den. Neither Scott nor Reynolds heard any gunshots or other noises, saw any flashes or saw anyone with a gun.

{¶14} Scott and Reynolds testified that after the body was thrown from the vehicle, the vehicle went in reverse and then forward, running over the lower part of the person's legs as it drove down Buckeye Road. Scott and Reynolds got out of the car and ran over to the person lying in the street. They recognized the woman as Fields-Edmonds. Another man who arrived at the scene opened her shirt, and they saw that Fields-Edmonds had been shot in the chest. Reynolds called 911. The 911 call was received at 2:36 a.m.

{¶15} Hicks' cell phone records show that he was in the area of East 83rd Street and Woodland Avenue around the time Fields-Edmonds was shot. Shortly after Fields-Edmonds' body was thrown from her vehicle, Hicks began making cell phone calls to his father (2:35 a.m.), his sister (2:38 a.m.), his brother (2:52 a.m.) and several other unidentified numbers.

{¶16} Cell phone records also indicate that Fields-Edmonds made a call to her best friend, Kecia Johnson, at 2:33 a.m. Johnson testified that she missed the call and immediately tried to call Fields-Edmonds back but got no answer. When Johnson listened to the voice mail message Fields-Edmonds had left her, she heard "just the sound of wind."

{¶17} Dr. Krista Timm, a forensic pathologist and deputy medical examiner at the Cuyahoga County Medical Examiner's Office, performed an autopsy on Fields-Edmonds. She testified that Fields-Edmonds died from two penetrating gunshot wounds — one to her left chest and another to her left neck below her left ear. Dr. Timm's examination also revealed blunt impacts to Fields-Edmonds' head and extremities, abrasions to her left and right hands and contusions on her face, left hand and right leg.

{¶18} Dr. Timm testified that she observed "punctate abrasions" on Fields-Edmonds' skin in the area around the bullet wounds but could not state whether these abrasions were the result of actual stippling, i.e., powder tatooing from hot gun powder impacting the skin, or pseudo-stippling, i.e., where a bullet is shot through an intermediary target and pieces of the target break off and travel with the bullet and impact the skin. Therefore, she was unable to determine the distance from which the gun was shot. She testified, however, that if there was no intermediary target between the muzzle and the victim's skin, the gunshot wounds would be consistent with an intermediate range gunshot wound, i.e., a target-to-muzzle distance of a couple of inches to a couple of feet.

{¶19} Hicks' father, Adrian McCall, also testified. At approximately 2:30 a.m. on December 21, 2013, McCall was awakened by a call from Hicks. McCall testified that when he answered the call, Hicks said, "daddy, my gun went off." Hicks explained that he had been drinking, that he and Fields-Edmonds had gotten into an argument and that his gun went off, shooting Fields-Edmonds. Hicks did not provide any further details. McCall testified that Hicks sounded a little intoxicated but was otherwise "just his self." He was not upset or excited and was not crying, yelling or screaming when he confessed to his father that he had just shot Fields-Edmonds.

{¶20} Approximately 15 minutes later, sometime between 2:30 a.m. and 3:00 a.m., Hicks arrived at McCall's house. McCall had assumed that Hicks had driven his truck but later noticed Fields-Edmonds' car parked across the street, several houses down. McCall testified that when he arrived at his home, Hicks may have been a little intoxicated but was not drunk. Hicks seemed to be calm, was not excited or scared and was not crying or yelling. As during the phone call, he seemed like himself.

{¶21} Hicks told McCall that he had also called his brother, Adrian Bolling. Shortly thereafter, Bolling arrived at McCall's house and the three men sat on the couch in McCall's living room trying to determine exactly what had happened. At some point during the conversation, Hicks pulled an "old-style type" revolver out of his pocket and began taking the bullets out of it. McCall told Hicks that he could not have a gun in his house and went into the kitchen and got a plastic bag into which he had Hicks drop the gun and bullets, and McCall threw the bag out his kitchen window into the backyard. McCall

testified that he "was a little tore up" because he loved Fields-Edmonds. At the time, although McCall knew Hicks had shot her, he did not know that Fields-Edmonds was dead.

{¶22} McCall, Bolling and Hicks then left McCall's house and drove in Bolling's car to Hicks' house so that Hicks could check on his truck. As they turned the corner towards Hicks' house, they saw a police car down the street. Bolling turned the car around and the three men headed back to McCall's house. Five or ten minutes later, Bolling and Hicks left the house a second time.

{¶23} Patrol Officer Kenneth Allen testified that, after the victim was identified as Fields-Edmonds, it was determined that two cars were registered in her name and he went to the address listed for the vehicles to see if he could obtain information from whomever might be living there regarding what vehicle Fields-Edmonds might have been driving. When he arrived at the residence, he noticed a white pickup truck in the driveway. He testified that he knocked on the door of the house but that no one answered. When it was later determined that the address listed for the vehicles was probably Fields-Edmonds' residence address, Officer Allen went back to the house a second time. Once again, the white truck was still in the driveway and no one answered the door. Officer Allen then continued to patrol the Fourth District. As he passed the house a third time, the white pickup truck was gone.

{¶24} McCall testified that two detectives and a uniformed officer came to his house to speak with him later that morning. When the police arrived, they informed him

that Fields-Edmonds was dead. McCall testified that he was crying, that his "head wasn't right" and that he was too "tore up" and upset to say much of anything to the police. A few hours later, after he "got [his] head together," McCall called the detectives and told them where they could find the gun. Several detectives then arrived at his home and recovered a plastic bag containing a revolver (the "gun"), several live rounds and two spent bullet casings from McCall's backyard.

{¶25} In addition to his father, several other people spoke with Hicks in the early morning hours following Fields-Edmonds' murder. Fields-Edmonds' "sister" Robinson testified that Hicks appeared "[l]aid back and calm" when she first spoke with him around 5:00 a.m. She stated that in a subsequent call his demeanor changed; Hicks seemed "panicky a little bit" and told Robinson he was "scared" because "everybody's calling my phone." Hicks' sister, Akhia Lash, testified that when Hicks arrived at her house around 6:30 a.m. that morning, he "seemed very upset," was crying and "very emotional" and was "a mess." She testified that she had "never seen him like this before."

{¶26} At approximately 7:10 a.m., Hicks picked up his brother and sister-in-law and they drove in his white pickup truck back to Hicks' house. When they arrived at the home, police officers pulled Hicks out of the truck, handcuffed him and placed him in the back of a police car. The clothing Hicks was wearing matched the description of the man with whom Scott had seen Fields-Edmonds talking at the Wolf's Den minutes before she was shot. Hicks was then taken to the Cleveland Police Department's Homicide Unit for questioning. The homicide detectives' interrogation of Hicks was recorded, and the state

played the videotape of the interrogation for the jury. Hicks was arrested a few hours later, after detectives located Fields-Edmonds' vehicle a few houses from McCall's house.

{¶27} Numerous samples were taken from Fields-Edmonds' vehicle and the clothing Hicks was wearing the night Fields-Edmonds was killed and tested. Curtiss Jones, supervisor of the Cuyahoga County Medical Examiner's Office's Trace Evidence Department, conducted testing on the gun, bullets and spent casings recovered from McCall's backyard and the clothing Hicks was wearing at the time Fields-Edmonds was killed. Jones testified that gunshot residue was found on samples taken from both cuffs of Hicks' jacket. He explained that one of the ways gunshot residue could have ended up on the cuffs was if someone had discharged a firearm while wearing the jacket. He indicated that the individual wearing the jacket could have also been in close proximity to a firearm discharged by another individual or that gun powder residue could have been transferred to the jacket from another source.

{¶28} With respect to testing performed for the presence of blood, Jones testified that no blood was detected on the revolver, the bullets or the spent casings. Likewise, no blood was detected on Hicks' cap, shirt, jacket, jeans, belt or boots.

{¶29} Carey Baucher, a DNA analyst with the Cuyahoga County Medical Examiner's Office, testified that preliminary testing of a couple of samples taken from Fields-Edmonds' vehicle resulted in a "very weak positive" for blood, indicating that the samples could contain the presence of blood. She further testified that, in her opinion,

the samples tested "didn't appear to really look like blood" and that because no confirmatory test was done to confirm the samples were blood, the "weak positives" could have been the result of a cross-reaction, i.e., if the sample included some other iron-containing compound. Other samples tested from the vehicle did not generate presumptive positive results for blood. With respect to the DNA testing that was done, Baucher testified that either no DNA was found or DNA was found in insufficient levels to link any known DNA profiles to any of the samples taken from under Fields-Edmonds' fingers, Fields-Edmonds' vehicle, the gun, the bullets or the spent casings.

{¶30} Detective James Kooser, a firearms examiner with the Cleveland Police Department, tested the gun recovered from McCall's backyard. He testified that the gun was a Harrington & Richardson .32 caliber Smith & Wesson long revolver. Based on his analysis of the bullets recovered from Fields-Edmonds' body, the spent casings and various test fires, he concluded that the recovered shell casings and one of the bullets recovered from Fields-Edmonds' body were fired from the gun recovered from McCall's backyard. With respect to the second bullet recovered from Fields-Edmonds, he concluded only that the bullet could have been fired from the gun. Kooser testified that the gun could fire in both single and double action but that during his testing, it fired only intermittently in double action.

{¶31} At the close of the state's case, Hicks moved for acquittal pursuant to Crim.R. 29(A). The trial court granted the motion as to Counts 2 and 3 of the indictment — aggravated murder in the course of a kidnapping under R.C. 2903.01(B) and

kidnapping under R.C. 2905.01(A)(3) — but denied the motion as to the remaining counts. Hicks presented no witnesses in his defense. After the defense exhibits were admitted into evidence, Hicks renewed his Crim.R. 29(A) motion as to the remaining counts.

{¶32} The jury found Hicks guilty of aggravated murder (Count 1), murder (Count 4) and felonious assault (Count 5) along with the associated firearm specifications. The jury found Hicks not guilty of grand theft (Count 7). The court found Hicks guilty of having weapons while under disability (Count 6), the associated firearm specifications, the notice of prior conviction and the repeat violent offender specification.

{¶33} Hicks' convictions for aggravated murder, murder and felonious assault merged for sentencing and the state elected to proceed to sentencing on the aggravated murder count. The one-year firearm specification also merged into the three-year firearm specification. On the aggravated murder count, the trial court imposed a sentence of life in prison without the possibility of parole plus three years on the firearm specification. On the having weapons while under disability count, the trial court imposed a sentence of 36 months, to be served consecutively to the sentences on the aggravated murder count and firearm specification. In all, Hicks received a prison term of life without the possibility of parole and an additional six years.[1] At the sentencing hearing, the trial court found that Hicks' prior criminal history warranted consecutive sentences and that consecutive sentences were necessary to fulfill the purposes and principles of felony

---

[1] The firearm specifications associated with the having weapons while under disability count merged with the firearm specifications associated with the aggravated murder count.

sentencing and were not disproportionate to the seriousness of the defendant's conduct and the danger to the public. However, these findings were not incorporated into the trial court's sentencing journal entry.

{¶34} This appeal followed. Hicks has raised the following three assignments of error for review:

> ASSIGNMENT OF ERROR NO. 1:
> The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(A), on the charge of aggravated murder, and thereafter entering a judgment of conviction of that offense which was not supported by sufficient evidence, in derogation of Defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.
>
> ASSIGNMENT OF ERROR NO. 2:
> The trial court erred by entering a judgment of conviction of aggravated murder that was against the manifest weight of the evidence, in derogation of Defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.
>
> ASSIGNMENT OF ERROR NO. 3:
> The trial court erred by failing to include in its journal entry its findings in support of its imposition of consecutive sentences.

## Law and Analysis

### Sufficiency of the Evidence

{¶35} In his first assignment of error, Hicks challenges the sufficiency of the evidence supporting his conviction for aggravated murder under R.C. 2903.01(A). Hicks argues that the state failed to present sufficient evidence that he killed Fields-Edmonds with "prior calculation and design" and that the trial court, therefore, erred in denying his Crim.R. 29 motion for acquittal on that count.

**{¶36}** A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13. Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the state's evidence is insufficient to sustain a conviction for an offense. *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134, ¶ 21. Accordingly, we review a trial court's denial of a defendant's motion for acquittal using the same standard we apply when reviewing a sufficiency-of-the-evidence claim. *Id.* at ¶ 21-23 ("Crim.R. 29(A) and sufficiency of evidence review require the same analysis."), citing *Cleveland v. Pate*, 8th Dist. Cuyahoga No. 99321, 2013-Ohio-5571.

**{¶37}** A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state has met its burden of production at trial. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1977). When reviewing sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *see also State v. Doumbas*, 8th Dist. Cuyahoga No. 100777, 2015-Ohio-3026, ¶ 12 ("'The test for sufficiency of the evidence is whether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational

trier of fact could have found all the essential elements of the offense beyond a reasonable doubt.'"), quoting *State v. Davis*, 49 Ohio App.3d 109, 550 N.E.2d 966 (8th Dist.1988), paragraph two of the syllabus. In a sufficiency inquiry, an appellate court does not assess whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at 387; *Jenks* at paragraph two of the syllabus.

{¶38} Hicks was convicted of aggravated murder under R.C. 2903.01(A), which provides, in relevant part: "No person shall purposely, and with prior calculation and design, cause the death of another * * * ."

{¶39} "''[P]rior calculation"and design * * * indicate[s] studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim.'" *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), quoting 1973 Legislative Service Commission Comment to R.C. 2903.01; *State v. Walker*, 8th Dist. Cuyahoga No. 99998, 2014-Ohio-1827, 10 N.E.3d 200, ¶ 16. The phrase is not defined in the Ohio Revised Code; however, the Ohio Supreme Court has interpreted it "to require evidence of 'more than [a] few moments of deliberation'" and "'a scheme designed to implement the calculated decision to kill.'" *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 38, quoting *State v. Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190 (1978), paragraph one of the syllabus. In other words, "[i]nstantaneous deliberation is not sufficient to constitute 'prior calculation and design.'" *Cotton* at paragraph two of the syllabus. "'[N]either the degree of care nor the length of time the

offender takes to ponder the crime beforehand'" is a "'critical factor'" in and of itself so long as it amounts to more than "'momentary deliberation.'" *State v. D'Ambrosio*, 67 Ohio St.3d 185, 196, 616 N.E.2d 909 (1993), quoting the 1973 Legislative Service Commission Comment to R.C. 2903.01. Although "'momentary deliberation' is insufficient," *D'Ambrosio* at 196, "prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001).

{¶40} The state can prove "prior calculation and design" from the circumstances surrounding a murder in several ways, including: (1) "evidence of a preconceived plan leading up to the murder"; (2) "evidence of the [defendant's] encounter with the victim, including evidence necessary to infer that the defendant had a preconceived notion to kill regardless of how the [events] unfolded" or (3) "evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill," such as where the victim is killed in a cold-blooded, execution-style manner. *State v. Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 75, citing *State v. Dunford*, 11th Dist. Ashtabula No. 2009-A-0027, 2010-Ohio-1272, ¶ 53; *State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, 844 N.E.2d 1218 (10th Dist.); *State v. Hough*, 8th Dist. Cuyahoga No. 91691, 2010-Ohio-2770, ¶ 19 ("[I]f the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design.").

{¶41} Whether a defendant acted with prior calculation and design is determined on a case-by-case basis, following an analysis of the specific facts and evidence presented at trial. *Orr* at ¶ 77; *State v. Jones*, 91 Ohio St.3d 335, 345, 744 N.E.2d 1163 (2001); *see also State v. Braden*, 98 Ohio St.3d 354, 364, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 61 ("'Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified."'), quoting *Cotton* at paragraph three of the syllabus. There is no "bright-line test" for determining the presence or absence of prior calculation and design; however, the Ohio Supreme Court has identified several factors to be weighed along with the totality of the circumstances surrounding the murder in determining the existence of prior calculation and design, including: whether the defendant and the victim knew each other and, if so, whether the relationship was strained; whether there was thought or preparation in choosing the murder weapon or murder site; and whether the act was "drawn out" or "an almost instantaneous eruption of events." *Taylor*, citing *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976); *see also State v. Woods*, 8th Dist. Cuyahoga No. 99630, 2014-Ohio-1722, ¶ 25.

{¶42} In this case, considering these factors along with the totality of the circumstances surrounding Fields-Edmonds' murder, we find that, after construing the evidence presented at trial (including all reasonable inferences that could be drawn from

that evidence) in the light most favorable to the state, there was insufficient evidence to establish beyond a reasonable doubt that Hicks acted with prior calculation and design in murdering Fields-Edmonds.

{¶43} The state argues that although "no one witnessed the murder itself," there was nevertheless "substantial circumstantial evidence" supporting the jury's finding that Hicks acted with prior calculation and design in murdering Fields-Edmonds. We disagree.

{¶44} The state can use either direct evidence or circumstantial evidence to prove the elements of a crime. *See, e.g., State v. Dura*, 58 Ohio St.3d 86, 92, 568 N.E.2d 674 (1991); *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph one of the syllabus; *State v. Bokeno*, 12th Dist. Butler No. CA2011-03-044, 2012-Ohio-4218, ¶ 12. Circumstantial and direct evidence are of equal probative value. *Jenks* at paragraph one of the syllabus. Circumstantial evidence is "proof of facts or circumstances by direct evidence from which the trier of fact may reasonably infer other related or connected facts that naturally or logically follow." *State v. Seals*, 8th Dist. Cuyahoga No. 101081, 2015-Ohio-517, ¶ 32, citing *State v. Beynum*, 8th Dist. Cuyahoga No. 69206, 1996 Ohio App. LEXIS 2143 (May 23, 1996); *see also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37 ("'Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.'"), quoting *State v. Griesheimer*, 10th Dist. Franklin No. 05AP-1039, 2007-Ohio-837.

**{¶45}** However, not all inferences are reasonable and in establishing facts by means of circumstantial evidence, one inference cannot be based solely on another. Although a trier of fact cannot draw an inference based solely upon another inference, an inference that is based in part upon another inference and in part upon additional facts is a "'parallel inference'" and, "if reasonable, may be indulged in.'" *State v. Cowans*, 87 Ohio St.3d 68, 78, 717 N.E.2d 298 (1999), quoting *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329, 130 N.E.2d 820 (1955), paragraph two of the syllabus. "'[C]ircumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 75, quoting *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990).

**{¶46}** As to the first factor, there is no dispute that Hicks and Fields-Edmonds knew each other and that their relationship had been strained. The state presented evidence that Hicks had returned home after spending three weeks away from the marital residence where he enjoyed "female company"— a fact which upset Fields-Edmonds. During his recorded interview with homicide detectives, Hicks admitted that his relationship with Fields-Edmonds was strained due to issues Hicks had with Fields-Edmonds' children and purported mutual acts of infidelity. Janeese Williams testified that the evening prior to Fields-Edmonds' murder, Hicks had an angry "outburst" when he overheard his wife talking about their marital problems with Williams. Hicks was seen talking to Fields-Edmonds in the Wolf's Den parking lot minutes before she was

shot; however, there is no evidence in the record as to Hicks or Fields-Edmonds' demeanor or whether they were arguing at that time. Neither Scott nor Reynolds were asked about this at trial. Although Scott testified that she twice told Fields-Edmonds to "be careful" as she was leaving the Wolf's Den — leading Reynolds to assume the couple had been arguing — Scott could not explain what led her to say this to Fields-Edmonds.

{¶47} With respect to the second factor — whether there was thought or preparation in choosing the murder weapon or murder site — the state argues that (1) Williams' testimony that, four hours before Fields-Edmonds' death, she saw Hicks grab what she, in hindsight, believes was a gun from his truck and place it in his waistband, and (2) the fact that right before Fields-Edmonds was murdered, Hicks "would have pulled [the gun] out from wherever he was concealing it" shows that Hicks gave thought to what he was doing and prepared to use his gun to murder Fields-Edmonds. The state further contends that the fact that (1) neither Scott nor Reynolds heard any gunshots or saw any flashes and (2) no one else came forward as a witness to the "actual murder" evidences thought and preparation in the selection of the murder site, i.e., that Hicks murdered Fields-Edmonds at a time and place where he knew there would be no witnesses to the murder.

{¶48} Even if we were to infer based on Williams' speculative testimony that Hicks retrieved a gun from his vehicle before he went out with Fields-Edmonds that evening, there is no evidence to suggest that, at the time he removed it from his vehicle (or at any other time that evening prior to shooting her) Hicks intended to use the gun to kill

Fields-Edmonds. Although the record reflects that Hicks had threatened to leave Fields-Edmonds again if she continued bringing up the issue of his infidelity, there was no evidence that he had threatened her life or had otherwise threatened her with physical harm. "[M]ere possession of a weapon is not, without more, evidence of prior calculation and design." *Hill*, 2013-Ohio-578, at ¶ 23, citing *State v. Davis*, 8 Ohio App.3d 205, 207, 456 N.E.2d 1256 (8th Dist.1982) ("The mere fact that defendant was carrying a gun on this occasion but was not carrying a gun on some earlier visit to a different bar is not sufficient to demonstrate a prior calculation and design to kill someone at this bar."); *State v. Johnson*, 10th Dist. Franklin No. 97APA03-315, 1998 Ohio App. LEXIS 2069, *16-17 (May 5, 1998) ("That defendant had a gun with him * * * is not, by itself, evidence of a prior calculation and design, given the testimony offered by defendant's girlfriend that he 'sort of frequently carried a weapon.'"); *see also Jenkins*, 48 Ohio App.2d 99, 103, 355 N.E.2d 825 ("That the defendant went to his car, removed a shotgun, and fired a shot in the trunk of the car and two shots at the victim is not, standing alone, evidence of prior calculation and design."). This case is distinguishable from cases in which prior and calculation design has been found where the defendant obtains a weapon and kills a victim after threatening him or her. *See, e.g., State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 151 ("a defendant's threat to obtain a weapon and kill his victim and his later actions carrying out that threat are enough to prove prior calculation and design"), citing *Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, at ¶ 45, and *State v. Sowell*, 39 Ohio St.3d 322, 333, 530 N.E.2d 1294 (1988).

**{¶49}** Likewise, the fact that "no one else came forward as a witness" to the murder is not evidence that Hicks acted with prior calculation and design. Even if we were to infer, based on the fact that "no one else came forward," that no one witnessed the "actual murder" that was simply happenstance. Scott and Reynolds saw Hicks and Fields-Edmonds in the Wolf's Den parking lot at approximately 2:30 a.m. Fields-Edmonds was next seen, approximately five minutes later, when her body was thrown out of her vehicle and into the street just before the intersection of East 83rd Street and Woodland Avenue. Although there is no evidence as to exactly where the murder took place, this sequence of events indicates that Fields-Edmonds must have been shot either in the Wolf's Den parking lot or somewhere near, or along the way to, the intersection of East 83rd Street and Woodland Avenue. The record reflects that there were a number of people in the Wolf's Den parking lot when Hicks and Fields-Edmonds were leaving the bar at closing time. The record further reflects that there were other vehicles at the intersection of East 83rd Street and Woodland Avenue at the same time as Fields-Edmonds' vehicle, including a couple of vehicles that had just left the Wolf's Den. Individuals in any one of those vehicles could have potentially witnessed the murder and, in fact, at least two of them witnessed Fields-Edmonds' body being thrown out of her vehicle.

**{¶50}** Common sense dictates that if Hicks had given thought or preparation to choosing the murder site, he would have determined to kill Fields-Edmonds at a time and place where there were no potential witnesses connecting him to the crime and would have

conceived of some plan for leaving the scene, disposing of Fields-Edmonds' body and disposing of the murder weapon besides throwing her body out of her car and into the street, driving off in her car and bringing the car and the gun he used to kill Fields-Edmonds to his father's house. Based on the evidence in the record, there is nothing about the location of the murder that reasonably supports the inference that Hicks exercised thought and preparation in his selection of the murder site.

{¶51} With respect to whether the act was "drawn out" or "an almost spontaneous eruption of events," the state points to (1) evidence of the location of the gunshot wounds, i.e., that they were "up close and personal," (2) the fact that Hicks shot Fields-Edmonds twice, once in her left chest and once in the neck under her left ear, and (3) Hicks' demeanor following the killing as evidence that Hicks acted with prior calculation and design.

{¶52} The state first argues that because gunshot residue was found on both cuffs of Hicks' jacket, the jury could reasonably infer that Hicks "did not pull out the gun quickly and fire the shot with one hand" but rather "pulled out the gun and held it with two hands, making sure his aim was accurate." The state further argues, based on the fact he shot her twice, that Hicks "would have either * * * shot [Fields-Edmonds] in the chest or neck first, moved the gun, reposition[ed] himself, [got] himself ready, and then fire[d] the other shot." This, it contends, establishes prior calculation and design. Once again, we disagree.

**{¶53}** The record reflects that approximately five or six minutes elapsed between the time Hicks was seen talking to Fields-Edmonds in the Wolf's Den parking lot and the time her body was thrown from the vehicle at the intersection of East 83rd Street and Woodland Avenue. This is not a case in which the murder was carried out over a protracted period of time. Although courts have recognized that "prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes," *Coley*, 93 Ohio St.3d at 264, 754 N.E.2d 1129, in most such cases in which prior calculation or design has been found to exist beyond a reasonable doubt, there is evidence as to when, where and how the murder occurred. *See, e.g., Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996 (where defendant upon hearing that his brother had been stabbed, retrieved a gun from his car and began shooting at the alleged perpetrator, his actions could evidence a plan to kill; "[a]lthough they took only a few minutes, [the defendant's] actions went beyond a momentary impulse and show that he was determined to complete a specific course of action"); *Taylor*, 78 Ohio St.3d at 20-23, 676 N.E.2d 82 (sufficient evidence existed to support finding that defendant acted with prior calculation and design in shooting victim two to three minutes after an argument in a bar where defendant and victim were rivals for girlfriend's affection, defendant ordered girlfriend out of the bar prior to shooting, defendant's companion positioned himself near door by victim, and defendant fired several additional shots after victim was already wounded and trying to crawl away). Here, by contrast, there is no evidence that establishes where, or under what circumstances, Fields-Edmonds was killed.

{¶54} Given the limited information in the record regarding the killing, the two most likely scenarios are that: (1) Hicks shot Fields-Edmonds while he was standing outside the driver-side door and she was seated in the vehicle, or (2) he killed her while the two were both inside the vehicle somewhere between the Wolf's Den parking lot and the intersection of East 83rd Street and Woodland Avenue. No "definitive blood" was found on any of the samples law enforcement took from Fields-Edmonds' vehicle, the gun, the bullet casings or Hicks' clothing that might have assisted in making the determination of where Fields-Edmonds was killed. Under either scenario — i.e., if the murder occurred inside the vehicle or while Hicks was standing next to the vehicle — the shots would have necessarily been fired within a few inches or a few feet of Fields-Edmonds irrespective of whether the killing was the result of prior calculation and design, as the state contends, or in the "heat of the moment," as Hicks contends.

{¶55} Although it is undisputed that two shots were fired, striking Fields-Edmonds in the left side of her chest and neck, there is no evidence in the record as to whether shots were fired over several minutes or in rapid succession. Detective Kooser testified that the gun could be fired in either single or double action and that in double action, the weapon could be fired "as fast as you can pull the trigger." Without knowing where, or under what circumstances, Fields-Edmonds was shot or what happened after the first shot was fired, it is impossible to know whether or to what extent Hicks may have had to change positions in order to shoot Fields-Edmonds a second time. Likewise, it is impossible to know whether the shooting was impulsive or whether Hicks had an

opportunity for reflection or to alter his course of conduct prior to taking his second shot. *Compare, e.g., State v. Conner*, 8th Dist. Cuyahoga No. 99557, 2014-Ohio-601, ¶ 58 (evidence that defendant made a deliberate decision to fire two rounds of shots and strategically positioned himself to carry out his plan was sufficient to establish that defendant acted with prior calculation and design where officer testified that he saw defendant point a gun in the direction of his zone car, shoot two to three times in the direction of the car, pivot and move from facing the officer to his right and then shooting another three to four shots) *with Hill,* 2013-Ohio-578, at ¶ 27 (fact that defendant shot victim three times, including once when the victim was down on his knees did not indicate prior calculation and design where the shots were fired in succession, "indicating that the act was one continuous course of events"; distinguishing cases finding prior calculation and design "where shots were fired initially and then again several minutes later or where the defendant pursued and then shot an injured victim who was trying to escape"). Accordingly, based on the limited information in the record regarding the moments leading up to Fields-Edmonds' murder, it cannot be reasonably inferred simply from the fact that Hicks shot Fields-Edmonds twice or the location of the gunshot wounds that Hicks acted with prior calculation and design.

{¶56} The state also makes much of the fact that Hicks did not show remorse or sorrow when witnesses saw or spoke with him several minutes to several hours following the killing. The state argues that this behavior is further evidence that Hicks had a prior calculation and design to kill Fields-Edmonds. Such testimony, without more, cannot

support a finding that Hicks acted with prior calculation and design. The record also reflects that at the time of or immediately after the murder, i.e., beginning at 2:35 a.m., Hicks began making calls to his father, sister, brother and others, which, as witnesses explained, was unusual for him. Further, when Hicks saw his sister later that morning, she testified that Hicks was "upset," "very emotional," crying and "a mess."

{¶57} Considering the totality of the circumstances surrounding Fields-Edmonds' murder, we conclude that the circumstantial evidence offered by the state was insufficient for the jury to find, beyond a reasonable doubt, that Hicks acted with prior calculation and design. Proof beyond a reasonable doubt cannot be based on conjecture, speculation or an assessment of the likelihood of various possibilities. *State v. Brown*, 8th Dist. Cuyahoga No. 98540, 2013-Ohio-1982, ¶ 31 ("It is well established that '[c]riminal convictions cannot rest upon mere speculation; the state must establish the guilt of the accused by proof beyond a reasonable doubt.'"), quoting *State v. Haynes*, 25 Ohio St.2d 264, 270, 267 N.E.2d 787 (1971); *State v. Chessman*, 2d Dist. Montgomery No. 24451, 2012-Ohio-1427, ¶ 20 (fact that a rational trier of fact could speculate that it was defendant's purpose or specific intent to deprive the owner of property she and her brother took "does not satisfy the reasonable doubt standard"); *State v. Miller*, 11th Dist. Lake No. 2002-L-162, 2004-Ohio-6342, ¶ 50 ("speculative evidence does not support a conviction beyond a reasonable doubt"). Proof beyond a reasonable doubt is not a mere probability or even a strong probability. It requires a fact finder to be "firmly convinced" of the truth of a fact, i.e., "proof of such a character that an ordinary person would be willing to rely

and act upon it in the most important of [his or her] own affairs." R.C. 2901.05(E); *State v. Givens*, 2d Dist. Clark No. 2005-CA-42, 2005-Ohio-6670, ¶ 11 ("Proof beyond a reasonable doubt is a very high degree of proof such that the jurors must be 'firmly convinced' of the proof of the charge."). Such proof was not present here.

{¶58} Following a careful review of the record and viewing the evidence in the light most favorable to the state, we conclude that the evidence does not support a finding of prior calculation and design beyond a reasonable doubt. Based upon the evidence presented, too much is unknown about the moments leading up to and the circumstances surrounding Fields-Edmonds' death for the jury to do anything more than speculate as to whether Hicks "planned a scheme to implement a calculated decision to kill" Fields-Edmonds, *Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, at ¶ 38, or whether her murder was the "result of an almost spontaneous eruption of events" without studied consideration, *Walker*, 2014-Ohio-1827, 10 N.E.3d 200, at ¶ 19. Accordingly, there was insufficient evidence to support Hicks' conviction for aggravated murder, and the trial court should have granted his motion for acquittal on the aggravated murder count. Hicks' first assignment of error is sustained. We, therefore, reverse Hicks' conviction for aggravated murder under R.C. 2903.01(A), vacate his sentence on the aggravated murder count and remand the case for resentencing.

{¶59} Given our ruling on Hicks' first assignment of error, Hicks' second and third assignments of error are moot.

**{¶60}** Conviction for aggravated murder reversed; sentence for aggravated murder vacated; case remanded for resentencing.

It is ordered that appellant recover from appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

LARRY A. JONES, SR., J., CONCURS;
FRANK D. CELEBREZZE, JR., A.J., CONCURS IN JUDGMENT ONLY