[Cite as *In re M.T.*, 2023-Ohio-2140.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: M.T. | : | APPEAL NO. C-220466 |
| | | TRIAL NO. 21-0931X |
| | : | |
| | : | |
| | : | *O P I N I O N.* |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Reversed and Case Remanded

Date of Judgment Entry on Appeal: June 28, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellant,

*Timothy Young*, Ohio Public Defender, and *Victoria Ferry*, Assistant Public Defender, for Defendant-Appellee.

**Bock, Judge.**

**{¶1}** The state charged 14-year-old defendant-appellee M.T. with multiple charges, including aggravated murder, murder, attempted murder, and felonious assault in connection with a February 2021 shooting near an apartment building on Westwood Northern Boulevard in Hamilton County, Ohio. Deontray Otis died at the scene. Two other people, Aaron Whitfield and Maliaya Freeman, were shot and injured.

**{¶2}** The state moved for the juvenile court to relinquish its jurisdiction over the case, which would move the case to adult court. The juvenile court determined that there was probable cause to believe M.T. committed all the offenses, with their specifications, except the aggravated-murder count. It found that the state had failed to provide credible evidence of prior calculation and design.

**{¶3}** The state appealed, arguing that the juvenile court erred by finding that there was no probable cause to believe that appellee M.T. committed the aggravated murder of Otis in violation of R.C. 2903.01. We agree with the state and reverse the juvenile court's judgment.

## I.    Facts and Procedure

**{¶4}** In February 2021, police received a report of a shooting on Westwood Northern Boulevard in Hamilton County, Ohio. The investigation showed that Otis had been driving a Saturn SUV with Freeman in the passenger seat and Whitfield in the rear passenger-side seat. Witnesses at the scene "described hearing multiple gun shots," and "seeing three male[] subjects wearing black masks running up the hill," and some witnesses "saw [the three males] get into a car that was waiting for them,

2

described as a gray or dark green possibly Chevy SUV." When the shooting began, Otis apparently tried to drive away, but crashed into a parked car.

{¶5} Investigators found 21 bullet strikes on the car that Otis was driving, plus 19 shell casings around the Saturn and behind a brick wall near the driveway where the shooting occurred. The ballistics report showed that three different guns were involved in the shootings. Investigators recovered guns from codefendants Jason Gray and Mario Gordon, but the third weapon was never retrieved. The ballistics report showed that multiple bullets had been fired from the third gun.

{¶6} One of the witnesses obtained the license plate number for the Chevy SUV. Cincinnati Police Homicide Detective Kelly Best, the lead investigator on the case, found that the license plate matched a Chevy SUV owned by Con Eric Inabinitt. Officers responded to Inabinitt's home.

<u>Bootleg cab driver told police that he provided the shooters' transportation</u>

{¶7} During a recorded police interview, Inabinitt stated that he used the SUV as a "bootleg cab." On the night of the murder, Inabinitt received a call from a woman to whom he had previously provided a ride. Inabinitt followed the woman's instructions to pick up Gordon and Gray from different locations. He then went to another location where he saw Carl Godfrey. Inabinitt did not pick up Godfrey; instead, M.T. got into the car. Gordon sat in the front seat, Gray sat in the back seat on the driver's side, and M.T. sat in the back seat on the passenger side. Inabinitt told police that all three passengers had a gun, and M.T. had a silver pistol with an extended magazine.

{¶8} Inabinitt said that he overheard Gray's conversation as he spoke to Godfrey over the phone. Godfrey and Gray instructed Inabinitt "to drive to various

locations around the city, trying to meet up with Sheisty," who is Aaron Whitfield. Inabinitt drove to 2691 Westwood Northern Boulevard and "stayed there for a minute" before driving to another location. Gray received another call and instructed Inabinitt to return to Westwood Northern Boulevard. Inabinitt told Best that he parked and waited, heard gunshots, and then drove to pick up his three passengers.

{¶9}   Inabinitt said he heard M.T. say that his gun had jammed. Inabinitt dropped his passengers off at three locations. Inabinitt was paid for his driving services. The state subsequently charged Inabinitt with the murder of Otis and shootings of Whitfield and Freeman.

<u>Best investigated additional suspects</u>

*Best interrogated Gray*

{¶10}   Based on Inabinitt's information, Best identified Godfrey and Gray as suspects. She retrieved messages between Godfrey and Gray. In those messages, Gray and Godfrey discussed where to carry out the murder. According to Best, they picked the location for the murder "because there's no cameras there."

{¶11}   Best retrieved Facebook communications between Godfrey and Gray from less than one hour after the shootings. Gray asked Godfrey whether he would receive payment. Godfrey responded, "The job ain't done." Gray stated, "Tell bra cuz got clapped. Give us half at least." Godfrey "kind of chastis[ed]" Gray for being "rusty." The next day, Gray messaged Godfrey, "[Y]ou were supposed to be going to knock off little cuz anyway yesterday," in reference to the killing of Otis.

{¶12}   In March 2021, Best conducted a recorded interview with Gray. After she showed Gray the communications she had retrieved about the murder, Gray admitted to his involvement.

{¶13} Best showed Gray photographs from which Gray identified Gordon, Godfrey, and M.T. Gray reported that when Inabinitt picked him up, Gordon was already in the car. They drove to a high-rise building, where M.T. and Godfrey were waiting, and retrieved firearms.

{¶14} Gray explained that when they arrived at the apartment building on Westwood Northern Boulevard, they walked past Whitfield, who was standing beside the Saturn. Whitfield asked if one of them was "Two Four." Gray's nickname was Two Four. Gray responded "no" and, along with Gordon and M.T., "walk[ed] behind the brick wall where all the shell casings were [later] found," waited until they received the "go ahead" from Godfrey, and ran out from behind the wall shooting at the vehicle.

{¶15} Gray told Best that M.T. shot at the vehicle: "I believe he [said] it jammed, but then he cleared it and continued firing." Further, according to Gray's statement to Best, M.T. instructed Inabinitt to pick them up when he heard gunshots. Gray told Best that he was supposed to be paid about $10,000 for the murder, but Godfrey called it a failed mission because they had not murdered Whitfield.

{¶16} After police arrested Gray, he wrote a letter while being held at the Hamilton County Justice Center. Gray stated that M.T. had nothing to do with Otis's murder. Best did not question Gray about the letter and did not know whether any jail calls occurred where Gray was prompted to "take the heat" for the shooting.

*Best interrogated Gordon*

{¶17} Best testified that, during her interrogation of Gordon, Gordon stated that M.T. had his own gun, which had jammed, but M.T. cleared it and unloaded it. Gordon, however, was not able to identify M.T. from a photograph, telling the

5

investigators that "I met [this] dude for an hour out of my whole life" and that Gordon "didn't really pay much attention to what they looked like."

{¶18} Gordon told Best a story similar to Gray's—that the three walked past "Sheisty," heard him ask about "Two Four," walked around the brick wall, got the go ahead over the phone, and ran out from behind the brick wall shooting. Gordon told Best that he thought they were supposed to commit a robbery, not a murder.

{¶19} Godfrey did not provide a statement to police. But in a phone call between M.T. and Godfrey sometime between March 21, 2021, and March 25, 2021, the two discussed "who was snitching on who." Godfrey told M.T. "that he had the opportunity to take out Jason Gray."

*Investigators gathered information about M.T.'s involvement*

{¶20} Best retrieved messages from Godfrey's cellular phone, which listed M.T.'s phone number as "Mini Twin Blood Thirsty." Best created a document reflecting communications between M.T. and Godfrey.

| 2/14/21, 8:10 pm | Godfrey to M.T. | "Who this" |
|---|---|---|
| 2/14/21, 8:10 p.m. | M.T. to Godfrey | "[M.T.]" |
| 2/14/21, 8:32 p.m. | Godfrey to M.T. | "Hell yeah it's on this week cuz ... big money" |
| 2/16/21, 9:39 p.m. | M.T. to Godfrey | "...when the pay hitting for that?" |
| 2/16/21, 9:42 p.m. | Godfrey to M.T. | "Mission failed" |
| 2/16/21, 9:42 p.m. | Godfrey to M.T. | "On bra what's next" |

{¶21} The messages then say there is a "move" where the money was guaranteed, as Godfrey states, "Just like this one was."

{¶22} Best collected M.T.'s DNA, which was not found on the swabs or the marijuana cigarette that were collected from inside the SUV, or from a Glock firearm or another firearm confiscated from Gordon's home. The crime lab report showed that three guns had been used during the shootings.

{¶23} Detective Takia Tyus interrogated M.T. He told her that he had met Godfrey and Godfrey's girlfriend on the day of the shootings, and they dropped him off "to some apartment on Westwood where he met up with a white male," who Tyus concluded was Inabinitt. Inabinitt took M.T., Gray, and "a guy with tattoos on his face [Gordon]" to an apartment building in Westwood. M.T. told Tyus that he got an all-black MP 9 mm gun from Godfrey, who "is kind of like a big cousin to him."

{¶24} M.T. told Tyus that Inabinitt took them to the apartment on Westwood Northern Boulevard to meet up with Whitfield. M.T. said that he did not respond when Whitfield passed and asked, "Is that Two Four?" because neither Gordon nor Gray responded. M.T. told Tyus that he heard gunshots when Whitfield got into his vehicle, so he pulled his gun and tried to fire but he could not do so because he had a "double feed" that was jammed. M.T. told Tyus that after he almost shot himself and was not able to unjam the gun, he ran back to Inabinitt's vehicle.

{¶25} At a bindover hearing, the court announced that it found probable cause for all charges that M.T. was facing, except for the aggravated murder (premeditated murder) of Otis. It dismissed the aggravated-murder charge. The juvenile court's entry stated that "no credible evidence of prior calculation and design was presented as required under R.C. 2903.01(A)."

## II.    Law and Analysis

{¶26}  R.C. 2152.12(B) governs discretionary bindovers. It allows the juvenile court to transfer a case alleging that a juvenile has committed an act that would be a felony if committed by an adult to the common pleas court if the juvenile court finds that (1) the child was 14 or older at the time of the charged offense, (2) probable cause exists that the juvenile committed the charged offense, and (3) the juvenile is not amenable to care or rehabilitation in the juvenile system. R.C. 2152.12(B); *State v. Reese*, 1st Dist. Hamilton Nos. C-180126 and C-180412, 2019-Ohio-3680, ¶ 14.

{¶27}  The state's burden in a bindover hearing is to provide credible evidence of every element of an offense to support a finding that probable cause exists to believe that the juvenile committed the charged offense. *In re T.S.*, 1st Dist. Hamilton No. C-200267, 2021-Ohio-1889, ¶ 12. "In meeting this standard the state must produce evidence that raises more than a mere suspicion of guilt, but need not provide evidence proving guilt beyond a reasonable doubt." *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 42, quoting *State v. Iacona*, 93 Ohio St.3d 83, 93, 752 N.E.2d 937 (2001).

{¶28}  In determining the existence of probable cause, the juvenile court must evaluate the quality of the evidence presented by the state in support of probable cause as well as any evidence presented by the respondent that attacks probable cause. *State v. Dell*, 5th Dist. Licking No. 2021 CA 00079, 2022-Ohio-2483, ¶ 62. Because a juvenile court's probable-cause determination involves questions of both fact and law, an appellate court defers to the juvenile court's determinations regarding witness credibility but reviews de novo its legal conclusion as to whether the state presented sufficient evidence to demonstrate probable cause to believe that the juvenile

committed the acts charged. *In re T.S.* at ¶ 12; *State v. Washington*, 1st Dist. Hamilton No. C-130213, 2014-Ohio-4178, ¶ 13.

A.    <u>Aggravated murder requires evidence of prior calculation and design</u>.

**{¶29}** Aggravated murder is purposeful killing with prior calculation and design: forethought, planning, choice of weapon, choice of means, and the execution of the plan. *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 28. To establish probable cause that M.T. committed aggravated murder, the state had the burden to provide credible evidence that M.T. "purposely, and with prior calculation and design," engaged in conduct that caused the death of Otis. R.C. 2903.01(A).

**{¶30}** The phrase "prior calculation and design" suggests advance reasoning to formulate the purpose to kill. *Walker* at ¶ 18. Sufficient evidence of prior calculation and design exists in cases where a murder was not instantaneous "but instead w[as] carried out over a period of time." *State v. Hundley*, 162 Ohio St.3d 509, 2020-Ohio-3775, 166 N.E.3d 1066, ¶ 76, quoting *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 74.

**{¶31}** Courts generally look to three factors to determine prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? (3) Was the act drawn out or 'an almost instantaneous eruption of events?' " *Id.* at ¶ 61. But there is no bright-line test to determine prior calculation or design. *Id.*

**{¶32}** Courts have considered additional factors to determine prior calculation and design, such as whether (1) the defendant expressed an intent to kill; (2) there was

9

a break in the encounter, giving time for reflection; (3) the defendant displayed a weapon from the outset and the number of shots fired; (4) there was evidence showing that the defendant had planned to kill regardless of how events unfolded; (5) there was circumstantial evidence showing that the defendant had a plan to kill, such as execution-style killing; and (6) any "evidence of a preconceived plan leading up to the murder." *See State v. Jefferson*, 5th Dist. Richland No. 2021 CA 0081, 2022-Ohio-3448, ¶ 67-75; *State v. Hicks*, 8th Dist. Cuyahoga No. 102206, 2015-Ohio-4978, ¶ 40.

B. <u>There was probable cause to believe that M.T. planned to commit murder</u>

{**¶33**} The juvenile court found probable cause that M.T. committed the three felonious assaults, attempted murders, and murder, all with the firearm specifications. Thus, the only issue before this court is whether M.T. acted with prior calculation and design.

{**¶34**} As an initial matter, Gray's jailhouse letter taking full responsibility for the murder and attempted murders is irrelevant to this court's review. It said that M.T. had nothing to do with the murders. The trial court already discounted that assertion when it found probable cause for the remainder of the charges.

{**¶35**} The juvenile court determined that no credible evidence showed prior calculation and design. But even if we ignored Best's testimony about her interviews with Inabinitt, Gordon, and Gray, the totality of the evidence showed that M.T. knew about the plan to murder Whitfield, expected pay for it, and participated in the plan.

{**¶36**} It appears that M.T. did not know any of the victims before the murder. Godfrey chose the murder site and, according to M.T.'s interview, Godfrey gave M.T. his gun. But most of the additional factors weigh in favor of finding probable cause of prior calculation and design.

{¶37} The murder was not an "almost instantaneous eruption of events." M.T. told police that Godfrey took him to an apartment where they met up with Inabinitt, Gray, and Gordon. M.T. admitted to securing a gun before getting into Inabinitt's car. M.T. said that Inabinitt drove him, Gray, and Gordon to an apartment to meet up with Sheisty (Whitfield). M.T. admitted to hiding behind the wall with his gun before coming out from behind it with Gordan and Gray. And M.T.'s gun jammed before he cleared it and shot it multiple times.

{¶38} There were multiple breaks in the action in which M.T. could have paused and reflected on whether he wished to commit murder. But M.T. chose to pull the trigger multiple times, killing Otis and harming the other two victims.

{¶39} But the most telling factors were M.T.'s expression of his intent to engage in these acts, regardless of how events unfolded, and M.T.'s conversations with Godfrey showing that he had a part in planning the murders. While M.T. said that he only attempted to shoot when he heard shots as Whitfield got into the car and did not shoot because his gun jammed, the ballistics report, the circumstances, and M.T.'s own words in his texts to Godfrey undercut these assertions and demonstrate his prior plan to kill.

{¶40} First, none of the three victims had a weapon. Because the three victims were unarmed, it is unlikely that M.T. attempted to shoot only because someone was shooting at him.

{¶41} Second, M.T. secured a gun well before the shootings. This shows that M.T. intended to use the gun in some manner.

{¶42} Third, the ballistics report showed 19 shell casings and 21 bullet strikes on the car—a significant number of bullets—from three different guns. M.T.

11

participated in the shootings.

{¶43}  Fourth, M.T. voluntarily got into a car to pursue Whitfield. Moreover, Otis's car crashed into other cars, indicating that he tried to drive away when the shooting started. Yet, they shot at him, Whitfield, and Freeman anyway. M.T. pursued the victims.

{¶44}  Fifth, and most telling, M.T.'s own words show prior calculation and design. Two days before the murder, Godfrey told M.T. that "it's on this week * * * big money." Just after the murder, M.T. asked Godfrey when he was getting paid; Godfrey told him that the mission had failed. M.T. responded, "[W]hat's next." Godfrey told him about a "move," which was worth "10," that was guaranteed money "just like this one."

{¶45}  The content and timing of these messages, combined with M.T.'s securing a gun, M.T.'s interview with Tyus, and the information contained in the ballistics report, show probable cause that M.T. planned at least two days earlier to kill Whitfield. M.T. knew about the plan, participated in the planning, and carried out the plan to commit murder. Probable cause existed that the murder was premeditated. Thus, we sustain the state's assignment of error.

### III.  Conclusion

{¶46}  The evidence shows that M.T. was aware that he would be involved in a killing at least two days before he murdered Otis. The trial court erred by finding no probable cause on M.T.'s aggravated-murder charge. We therefore sustain the state's assignment of error and reverse the juvenile court's judgment.

Judgment reversed and case remanded.

**ZAYAS, P.J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.