[Cite as *State v. Wilson*, 2024-Ohio-2257.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 112690 |
| v. | : | |
| CHARNISHA WILSON, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED
IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:** June 13, 2024

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-670220-B

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Carson Strang, Assistant Prosecuting
Attorney, *for appellee.*

Patrick S. Leary, *for appellant.*

LISA B. FORBES, J.:

{¶ 1}  Charnisha Wilson ("Wilson") appeals her convictions for three counts of murder and other associated offenses.  After reviewing the facts of the case and pertinent law, we affirm in part, and vacate in part, the trial court's decision.

## I. Facts and Procedural History

{¶ 2} On November 16, 2021, Napoleon Abrams ("Abrams") was shot and killed inside a house in Cleveland. On November 22, 2021, Latrice Burks ("Burks") was shot and killed while walking down a street in Cleveland. A silver Nissan Altima ("the Nissan") belonging to Terry Foster ("Foster"), who is Wilson's codefendant in this case, was linked to both homicides via surveillance video. Additionally, ballistics testing revealed that the same 9 mm handgun was used to kill both victims. The Cleveland police developed a theory that Foster shot and killed Abrams, and Wilson aided and abetted Foster in doing so, and that Wilson shot and killed Burks.

{¶ 3} On May 9, 2022, Wilson and Foster were charged in a 26-count indictment related to the murders of Abrams and Burks. On February 1, 2023, Foster pled guilty to reduced charges, and on February 24, 2023, the court sentenced him to an indefinite term of 21-years-to-life in prison. *See State v. Foster*, 8th Dist. Cuyahoga No. 112564, 2024-Ohio-1160. Wilson's case was tried to the bench on February 21, and 22, 2023, and on February 24, 2023, the court found Wilson guilty of the following offenses:

- Murder in violation of R.C. 2903.02(A);

- Two counts of murder in violation of R.C. 2903.02(B);

- Four counts of felonious assault in violation of R.C. 2903.11(A)(1);

- Four counts of felonious assault in violation of R.C. 2903.11(A)(2);

- Aggravated burglary in violation of R.C. 2911.11(A)(1);

- Aggravated burglary in violation of R.C. 2911.11(A)(2);

- Three counts of drug possession in violation of R.C. 2925.11(A); and

- Possessing criminal tools in violation of R.C. 2923.24(A).

Wilson's murder, felonious-assault, and aggravated-burglary convictions carried various firearm specifications.

{¶ 4} On April 6, 2023, the court sentenced Wilson to an indefinite term of 41-years-to-life in prison. Wilson now appeals raising three assignments of error for our review:

I. The verdicts were against the manifest weight of the evidence.

II. The verdicts were not supported by sufficient evidence.

III. The trial court erred by imposing consecutive sentences.

## II. Trial Testimony and Evidence

{¶ 5} The following testimony and evidence was presented at Wilson's bench trial.

### A. Connor Semonin

{¶ 6} Connor Semonin ("Off. Semonin") testified that he is a patrol officer with the city of Cleveland. He was working in the early morning of November 22, 2021, when he and his partner responded to a call at 2232 E. 79th Street. He arrived at the house "right around 6:50 a.m.," and at that point EMS was "covering what looked * * * to be a body with a sheet." The body was "across the street on the left side where there would be a sidewalk and some fencing area, kind of an[] open field * * *." Semonin later learned that this body was Burks, and she had a "bullet hole in

her * * * lower back area." Semonin "located first a live round of nine millimeter ammunition near * * * Burks's body and then later on also discovered [a] spent cartridge of the same nine millimeter casing." Semonin testified that he and other officers interviewed neighbors, but nobody claimed to have witnessed the shooting, and ultimately Semonin left the scene without any suspects.

**B. Joseph Armstrong**

{¶ 7} Joseph Armstrong testified that he is 48 years old and has lived on "114 [and] Miles" his whole life. At times, he lived with his uncle, who was the victim Abrams in this case. On November 16, 2021, in the early morning hours, he was at Abrams's house on E. 114th Street, playing on his tablet. Armstrong was in the front room[1] of the house on the couch. Abrams and a "lady named Birdie" were there as well. People had "came and went" during the time he was there, and according to Armstrong, people were "doing drugs." At one point, a lady named "B" came into the house. During the trial, Armstrong identified "B" as Wilson. Armstrong has known Wilson from the neighborhood for "some years."

{¶ 8} At one point, Wilson and Abrams went in the back room and "[g]ot to arguing and said some words and whatnot. She walked outside. Few minutes after that he walked outside behind her." Armstrong testified that there was no glass in the windows in the house, "just plastic on the windows * * * so you could basically hear everything that's outside." According to Armstrong, Abrams and Wilson were

---

[1] It was established later at trial that this front "room" is an enclosed porch at the front of the house.

arguing outside for "[p]robably about five minutes." Abrams came back in the house, closed and locked the door, and went into his bedroom in the back of the house. Birdie was sitting on the porch couch with Armstrong. Armstrong did not see Wilson again that night.

{¶ 9} Armstrong testified that a "few minutes later" he heard a "pounding on the door then like some loud a** booms, the door just flew open." Abrams came into the front porch where Armstrong was. Armstrong testified about what happened next: "By the time [Abrams] got to the door, * * * [it] came flying open. And by the time [Abrams] turned around I just heard all of the gunshots and [Abrams] fell right in front of me. I got hit in the back. I just slumped over and then I just heard another shot after that couple shots after that and I heard the lady scream which was Birdie."

{¶ 10} According to Armstrong, the shooter was male because he heard the shooter say, "Mother F****r." Armstrong said he heard "about five or six" gunshots. Armstrong testified that he was "[s]hot in the upper and middle of my back, couple inches from my spine or I would have been paralyzed." Armstrong said he then "heard a car skirt off" and explained that this is "when you hit the gas real fast and the car burn rubber * * *."

{¶ 11} Armstrong testified that Wilson and Abrams were "pretty much" in a relationship. "They was going together." Armstrong further testified that, at the time of trial, he was living in a drug-treatment facility.

{¶ 12} On cross-examination, Armstrong clarified that Abrams was not his uncle, but rather a family friend that he has known his "whole life." Armstrong testified that he has been convicted of at least four felony-drug offenses in the last ten years. According to Armstrong, he was not "doing drugs" on the night in question, but everybody else was smoking "crack." Armstrong's drug of choice is PCP, and he has been smoking it daily since 1990. Asked when he stopped, Armstrong answered, "I haven't stopped," until four days ago, when he checked himself into the drug-treatment facility. He further testified that he had smoked PCP "earlier" on the night in question.

{¶ 13} Armstrong testified that he heard more than just Wilson and Abrams arguing when they went outside, but he did not know who the other person or people were. Armstrong also did not see who shot Abrams, because Armstrong had his back to the door when he was sitting on the porch couch. According to Armstrong, "might have been 30, 40 people came through" the house that day and night to smoke crack. "It was a smoke house. That's what they did. They got high in that house."

### C. Thomas Lascko

{¶ 14} Thomas Lascko ("Det. Lascko") testified that he is a detective in the crime-scene unit of the Cleveland Division of Police, and he was working on November 16, 2021. Det. Lascko responded to a homicide call at 4295 E. 114th Street, and when he arrived, he took approximately 200 photographs. According to Det. Lascko, the body that was lying on the floor when he arrived was in the same position that can be seen in the pictures he took, and he did not move or alter the

body in any way. "It is a body of an African-American male laying on his back face up in the first floor living room with a gray sweatshirt * * * and pink pants with yellow writing on the leg wearing white socks."

{¶ 15} In addition to taking pictures of the body, Det. Lascko took pictures of five fired shell casings found on the living room floor. All five casings were "S and B 9 by 1921s." Det. Lascko testified that when you fire a semiautomatic pistol, the shell casings "eject to the right" and land between "six inches and probably six feet, seven feet" away.

### D. Tommy Manson

{¶ 16} Tommy Manson ("Det. Manson") testified that he is also a detective with the crime-scene unit of the Cleveland Division of Police, and he was working on November 22, 2021. Det. Manson was dispatched to a homicide on E. 79th Street, and he took photographs of the scene. The victim was found on the east sidewalk by abandoned fields, and the body was already covered by a sheet when he arrived. Det. Manson took pictures of a "fired cartridge casing and a live round" found on the sidewalk. Det. Manson testified that the casing was a "fired S and B 9 1921. * * * I can tell you it's a nine millimeter cartridge casing * * *" and the live round was a "S and B 9 by 1921."

### E. Marissa Esterline

{¶ 17} Marissa Esterline ("Esterline") testified that she is forensic scientist specializing in DNA analysis, and she works for the Cuyahoga County Regional Forensic Science Laboratory. Esterline testified that Detective Zara Hudson from

the Cleveland police submitted for testing "two swabs touch DNA from steering wheel[,] gear shift, start button, [and] interior driver's door handle." According to Esterline, a "match was identified between [these swabs] and Charnisha Wilson" as well as Foster. Esterline further tested swabs from "interior/exterior passenger door handles [and] window control switch." Esterline testified that a "match was identified between" the passenger-door swabs "and Charnisha Wilson." Furthermore, there was "[n]o statistical support for a match" between these swabs and Foster.

### F. Vesna Piscitello

{¶ 18} Vesna Piscitello ("Piscitello") testified that she works for the "[c]ity of Cleveland Police in the real time crime center," which is "a unit compiled of civilians and officers in which we have access to [c]ity of Cleveland cameras to review them in regards to incidents that occur around the city." Piscitello reviewed footage from "cameras near * * * East 114th Street and Miles" on November 16, 2021. According to Piscitello, at first the police did not know at what time Abrams was murdered, and Piscitello initially did not find anything "of interest" on the video footage. Piscitello's testimony continued:

> As more evidence was gathered and several other incidents occurred around the city another homicide[2] occurred approximately a week later involving a silver sedan, a two-door sedan. And as I went back to review [the November 16, 2021 footage] just to make sure that I wasn't missing anything and I happened to see the same vehicle pulling onto East 114th Street and leaving it shortly after as the vehicle in the homicide.

---

[2] Piscitello explained that the second homicide was the murder of Burks.

{¶ 19} Piscitello "tracked" this vehicle to an apartment complex in "the area of East 46th Street and Outhwaite in Scovill." According to Piscitello, Foster lived in this area. Piscitello identified this vehicle as a "silver Nissan [A]ltima coupe with tinted windows," which was later determined to be the Nissan at issue in this case.

{¶ 20} Piscitello testified that she takes "raw footage" from all the relevant cameras and compiles the pertinent clips into a "combined video," which she gives to the police. The combined video in the case at hand ("the Combined Video") showed the Nissan driving from the E. 46th Street area to "the area of East 114th Street and Miles Avenue" from 5:33 a.m. to 5:46 a.m. on November 16, 2021. The Combined Video also showed the Nissan driving the other way on E. 114th Street starting at 5:50 a.m. According to Piscitello, the Nissan took a "[s]imilar route" back to the E. 46th Street area, arriving at approximately 6:05 a.m.

{¶ 21} Piscitello testified that because of the dark-tinted windows, she was unable to identify the occupants of the Nissan. She did, however, testify that "you can see that there's a shadow in the passenger side" of the Nissan in the Combined Video when the car is driving away from the scene of Abrams's murder.

{¶ 22} Piscitello was also asked to pull video footage concerning the murder of Burks, and this footage became part of the Combined Video. She received this call from the police on November 22, 2021, between approximately 6:15 and 6:30 a.m. Piscitello testified as follows regarding this portion of the Combined Video:

> I was able to locate [Burks] prior walking southbound on East 79th Street. She was walking by herself. And a silver two-door vehicle passed by her traveling northbound on East 79th Street. And she

appeared to turn her head and look back at the vehicle. There's no audio so I don't know if there is anything that occurred. And she continued walking southbound and the vehicle went north on 79th Street to eastbound on Carnegie as she — they separated ways.

She continued walking down. It took her a few minutes to walk all the way down. And the location where she was found is in the distance in the video. And then when she gets about halfway down 79th Street [between] Central and Cedar a vehicle is observed stopping and she walks in front of the vehicle and goes to the passenger side of it.

At that time in the distance you can see her fall, the vehicle remain[ed] there for another minute or so, and then it turned around in the driveway and traveled back southbound on East 79th Street with its headlights off.

{¶ 23} The Combined Video also shows the Nissan leaving the apartment complex on E. 46th Street at 3:15 a.m. on November 22, 2021. The Nissan is seen traveling to E. 79th Street at 3:20 a.m. and passing Burks as she is walking. At 3:25 a.m., the Nissan stops in the street and Burks approaches the passenger side. At this point, the Nissan's headlights are turned off. According to Piscitello, "[i]t appears that [Burks] falls to the ground." Piscitello testified that "it appear[ed]" from the video that somebody got out of the Nissan on the passenger side and went "to the rear of the vehicle." The Nissan drove away from the scene with the headlights still off, and at 3:28 a.m., the Nissan can be seen with the headlights on traveling south on E. 79th Street. At 3:45 a.m., the Nissan is seen traveling south on Martin Luther King, Jr. Boulevard near Kinsman. The Nissan was out of any camera's view for the next 20 minutes, and at approximately 4:06 a.m., it can be seen pulling into the apartment complex on E. 46th Street.

**{¶ 24}** Piscitello next testified about a red or maroon Ford Escape ("the Escape") that she tracked via surveillance videos. At 4:13 a.m. on November 22, 2021, the Escape is seen driving on Kinsman near E. 93rd Street. Piscitello testified that, via the Escape's license-plate number, she was able to determine that the Escape was "registered to Ronny Wilson. Which was determined to be related to Charnisha Wilson." Piscitello testified that the Escape travelled to JACK Cleveland Casino (the "Casino") in downtown Cleveland and arrived there at 4:38 a.m. The Escape is seen leaving the Casino at 4:58 a.m. The Escape is next seen on camera at 5:41 a.m. in front of Wahlburgers, which is a restaurant near the Casino. The Escape leaves downtown and travels to E. 79th Street and Central Avenue, which is where Burks was murdered, driving past the scene at 6:02 a.m. The Escape leaves the E. 79th Street area and the last time it is seen on the Combined Video is at Quincy Avenue and Woodhill Road. According to Piscitello, the Escape's windows are tinted, and she could not see who was in the Escape.

**G. Dr. Felo**

**{¶ 25}** Joseph Felo, M.D., ("Dr. Felo") testified that he is "the chief deputy medical examiner and forensic pathologist for the Cuyahoga County Medical Examiner's Office." Dr. Felo testified about Abrams's and Burks's autopsy reports. According to Dr. Felo, "Abrams's cause of death is gunshot wounds of trunk and right lower extremity with visceral skeletal and spinal cord injuries." Dr. Felo testified that the "lethal entrance gunshot wound [was to] the left side of his chest."

{¶ 26} Dr. Felo testified that Burks had "one lethal gunshot wound and that is of her chest." The bullet entered Burks at her left breast and exited at the "left middle back area," piercing her heart and left lung. Dr. Felo further testified that the bullet travelled "slightly downwards" with the exit wound approximately four inches lower than the entrance wound.

**H. Jacob Kunkle**

{¶ 27} Jacob Kunkle ("Agent Kunkle") testified that he is employed by the FBI as "the supervisory senior resident agent of the Canton and Mansfield offices * * *." Agent Kunkle is "part of the FBI's cellular-analysis survey team or CAST for short," which assists the Cleveland Police with "historical records generated by cellular communication devices * * *."

{¶ 28} Agent Kunkle was given the records for two cell phone numbers, and from this data he generated a report showing "the general areas where [each] particular device was located on the date and the time that's represented." Agent Kunkle testified that he was informed that a homicide took place at 4295 E. 114th Street, in Cleveland, on November 16, 2021, at approximately 5:45 a.m., and a second homicide took place at 2232 E. 79th Street, in Cleveland, on November 22, 2021, at approximately 3:26 a.m. He further testified that he was told that Wilson and Foster lived together at 5024 Scovill Avenue, in Cleveland.

{¶ 29} Agent Kunkle testified that, on November 16, 2021, between 5:41 and 5:46 a.m., there were three communications between the cell number ending in 5244 and the cell number ending in 9203. According to Agent Kunkle, "those

communications indicated that the devices were in the general area of where the Abrams homicide occurred which was down at 4295 East 114th Street in Cleveland." Agent Kunkle explained that he could not "specifically say that the devices were at that location but they were in that several square mile area that would be consistent with that location."

{¶ 30} The first communication, which took place at 5:41 a.m., "was a call placed from the 5266 number * * * to the 9203 phone * * *." The second communication occurred at 5:46:04 a.m., and "the * * * phone 5266 receives [a] call from the * * * phone 9203." At this point, the 5266 number "remained in the same general area where it was utilizing the same tower," and the 9203 number "had moved [and] appears on the map to be closer to the homicide scene * * *." The third communication also occurred at 5:46:16 a.m. and that "was a call from the * * * phone 9203 back to the phone * * * 5266." For this call, both phones used the same tower that the 5266 number had been using.

{¶ 31} Agent Kunkle additionally testified that on November 22, 2021, the 9203 phone showed a call to a 4900 number at 3:37 a.m. At that time, the 9203 phone was in the "Woodland Hills, Buckeye, Shaker area * * *." At 3:38 a.m., a call was made from the 9203 phone to the 5266 phone. The 9203 phone "utilized the same tower over in the Buckeye Shaker area and the [5266] phone utilized a tower for that communication over in the general area of the Foster and Wilson residence." Asked if he was "able to say definitively whether either of these devices * * * were in the vicinity of East 79th Street at approximately 3:26 a.m.," Agent Kunkle answered,

"No." According to Agent Kunkle, the two devices were not "hitting off of any towers at the time of the homicide."

{¶ 32} Agent Kunkle testified as to the limitations of a cell-phone records analysis as follows:

> One: I can't testify to who physically had the device on the date and time in question. * * *
>
> Two: I can't tell you specifically where a device was based on these records. I can only give a general area. * * *
>
> And then the third kind of limitation of this is I have no insight into the content of any of the communications that occurred whether they be by text or voice calls or IM chats or anything else. I don't know what was said during those communications.

### I. James Kooser

{¶ 33} James Kooser ("Kooser") testified that he is forensic scientist and firearms and tool marks examiner for the Cuyahoga County Regional Forensic Science Laboratory.

{¶ 34} For the Abrams murder, Kooser analyzed "five fired S and B nine by 19 spent cartridge casings" and "two bullet fragments" found at the scene. The two bullet fragments were "consistent with having been fired from a nine millimeter caliber firearm manufactured by Smith & Wesson." Kooser explained that the "individual characteristics" established that the two bullet fragments were fired from the same pistol. Furthermore, the five spent casings were fired from the "same unknown nine millimeter firearm." Kooser testified that he "can't tell you for sure" whether the bullet fragments and fired casings came from the same firearm.

{¶ 35} For the Burks murder, Kooser analyzed "one fired S and B nine millimeter caliber cartridge case" submitted from the Cleveland police. Kooser testified that the cartridge case from the Burks murder scene and the five cartridge cases from the Abrams murder scene "were fired by the same unknown nine millimeter caliber firearm."

{¶ 36} According to Kooser, when someone fires a "self-loading pistol," such as a "Smith and Wesson nine millimeter semiautomatic firearm [n]ormally the ejection port is on the right so when a cartridge case comes back and hits that ejector which is usually on the left it will kick it out to the right." Kooser further testified that "[i]f you are firing inside a car across the person in there or just a seat [the shell casing] should stay in the car." Asked if it could "bounce outside the car" if the window was open, Kooser replied, "Absolutely. It could * * * ricochet out. You are [a] hundred percent correct." Kooser agreed that the casing "could bounce any number of ways," and that "we need a physicist in here to tell us what the variables are."

**J. Zara Hudson**

{¶ 37} Zara Hudson ("Det. Hudson") testified that he is a homicide detective for the Cleveland Division of Police. On November 16, 2021, Det. Hudson was assigned to investigate Abrams's homicide. Det. Hudson canvassed the neighborhood around E. 114th Street south of Miles Avenue but was not able to speak to anyone who witnessed the homicide. Det. Hudson obtained surveillance video from a gas station on Miles that showed "Birdie" after the shooting. At trial,

he identified "Birdie" as Jacqueline Jones. Birdie came to the homicide unit to speak to Det. Hudson "a few weeks after the actual homicide on the 16th." When he spoke with her, Birdie had a "suspected bullet defect in her left eye[3]." At some point during the interview, Birdie was taken to the hospital. Det. Hudson testified that Birdie did not go to the hospital immediately following the shooting at Abrams's house.

{¶ 38} Birdie's medical records from MetroHealth, dated November 17, 2021, were introduced into evidence, and Det. Hudson identified the records. According to these medical records, Birdie was being interviewed by the police when she complained of leg pain, and she was transported to the hospital at 1:15 p.m. The notes from Birdie's medical records state in part as follows: "1 healing wound scabbed over to medial mid-thigh, 1 healing wound nearly scabbed to L lateral buttocks." Birdie self-reported that the gunshot wounds "occurred 1 day ago at 6 AM." Under the heading "X-ray * * * FINDINGS/IMPRESSION," Birdie's medical records indicate, "Status post gunshot injury to the left thigh with * * * small retained bullet fragments." Additionally, the physician's notes indicate "2 wounds suspicious for remote GSW. * * * She states that she fell asleep last night and then began having left leg pain and she thinks that she was shot but has no other recollection."

---

3 The state introduced into evidence photographs of Birdie at the hospital, and the bullet wound is on her left thigh.

{¶ 39} Det. Hudson also learned that "an individual by the name of Dough Boy," who was later identified as Armstrong, had also been shot at the Abrams murder scene.

{¶ 40} Det. Hudson testified that he "learned of a potential suspect that had walked into the residence, shot several people and then left after [a] confrontation between [Abrams] and [Wilson]." Det. Hudson learned the identity of Wilson when he was investigating the homicide of Burks on November 22, 2021, and he interviewed "the primary suspect, Terry Foster."

{¶ 41} According to Det. Hudson, Piscitello "combed through the video surveillance footage" and saw Burks walking in the street between 3:20 and 3:26 a.m. "And she was approached by a silver vehicle," which came to a stop on E. 79th Street. Det. Hudson next testified that he saw "an object hit the ground." The Combined Video was played for Det. Hudson, and he testified that the "passenger side rear taillight" becomes "obstructed by an object or a person." According to Det. Hudson, this happened twice. Det. Hudson further testified that "[a]t one point during the video it appears that there is some movement on the driver's side of the vehicle." Det. Hudson testified that this was "significant" to the investigation because "[i]t appeared that the passenger of that vehicle was the one outside of the vehicle moving around."

{¶ 42} Through this video, Det. Hudson and Piscitello tracked the Nissan after it stopped on E. 79th Street. The Nissan went out of camera range at 3:45:31 a.m. near Martin Luther King, Jr. Boulevard and Kinsman Road. The Nissan came

back into camera range at E. 93rd and Marah Avenue at 3:45:55 a.m. The Combined Video then tracked the Nissan "all the way back to Scovill Avenue. * * * Back to Terry Foster's apartment at 5824 Scovill Avenue." Det. Hudson testified that the Nissan arrived at the Scovill address at 3:59 a.m.

{¶ 43} The Combined Video shows that, at 4:13 a.m., the Escape "emerges" from the 93rd and Kinsman area and travels "[w]estbound towards downtown." Det. Hudson testified that this area is "probably five or six blocks just north of where we last saw the Nissan * * *." The Combined Video tracks the Escape to the Casino, arriving at 4:38 a.m. Wilson is seen getting out of the Escape at this time.

{¶ 44} Surveillance footage from the Casino shows Wilson entering the Casino at 4:43 a.m. Video footage also shows Wilson leaving the Casino at 4:46 a.m., and the Escape is seen driving away from the Casino at 4:58 a.m. The Escape is seen back at the Casino at 5:41 a.m. When the Escape leaves the Casino for the second time, it travels past the scene of Burks's murder on E. 79th Street between Cedar and Central Avenue. This is recorded on the Combined Video at 6:02 a.m.

{¶ 45} Det. Hudson testified that he reviewed cell-phone records for Wilson, and her cell phone number was 216-***-5266. Det. Hudson also reviewed Foster's cell phone records, and his number was 216-***-9203. According to Det. Hudson, at 3:38 a.m., which is 12 minutes after Burks was murdered, Wilson's cell phone was "hitting off the tower" in "the area of * * * Foster and * * * Wilson's residence at 2454 Scovill Avenue." Det. Hudson testified that a call was placed from Wilson's cell phone to Foster's cell phone at 6:07 a.m. Records show that Wilson's phone "hit on"

a tower located at 2181 Ambleside, which is "in the same city in the general area" of the location of Burks's homicide. According to Det. Hudson, this was significant because "[i]t was a call to the suspect in the time frame of the second vehicle driving past the crime scene in the area." Another call was placed from Wilson's phone to Foster's phone at 6:23 a.m., and Wilson's phone was "using" a cell tower located at 3510 Orange Avenue.

{¶ 46} Det. Hudson went to Foster's residence on November 22, 2021, "a few hours after the initial investigation of the scene" of Burks's murder. Det. Hudson testified that he saw the "suspect vehicle" parked "in an ancillary parking lot," but at the time, he did not know whose vehicle it was. He ran the license plate number, and the vehicle "came back to" Foster. Det. Hudson obtained a search warrant for the residence. Asked if he executed the search, Det. Hudson testified as follows: "Yes. While in company with the Cleveland Police SWAT team they made a dynamic entry into the residence while the homicide unit covered the rear." Det. Hudson testified that Foster was home at the time of the search.

{¶ 47} In plain view, police recovered the following items from Foster's residence: marijuana; "PCP being packaged in individual vials for sale"; "a cooking glove and some scissors"; mail addressed to Foster; a cell phone; a prescription bottle and pills; a "black bag with U.S. currency"; "and a credit card, ID, Nissan keys and a black holster." Det. Hudson testified that the keys "belonged to" the Nissan at issue in the Abrams and Burks murders.

{¶ 48} Det. Hudson testified that "it appeared that the residents of that apartment were selling narcotics from [the] window, specifically crack cocaine, marijuana and PCP." Asked if "any of the items sent to the lab test[ed] positive for crack cocaine," Det. Hudson answered, "Yes." Asked if he found "any evidence in this search or otherwise that * * * Wilson resided at this residence," Det. Hudson replied, "I can't recall at this time." However, when Det. Hudson interviewed Wilson, Wilson said she lived "[w]ith * * * Foster at 5024 Scovill Avenue."

{¶ 49} On November 29, 2021, police searched the Nissan. Det. Hudson testified that the Nissan's windows were "extremely tinted." Swabs were taken from the "interior, exterior passenger door handles and window controls" as well as "the steering wheel, gearshift, start button, [and] interior door handle" of the Nissan. Det. Hudson sent the swabs to the Cuyahoga County Regional Forensic Science Laboratory for DNA analysis.

{¶ 50} Det. Hudson testified that he "came into contact with" Wilson on December 17, 2021, and attempted to interview her. However, "it was apparent that * * * Wilson was under the influence of an unknown controlled substance. She was unable to answer our questions so at that point in time she was conveyed to a hospital for her wellbeing." Several days later, Det. Hudson interviewed Wilson at the "homicide unit." He collected a "buccal swab" from Wilson at that time and sent the swab to the "lab for testing." According to Det. Hudson, Wilson "admitted to being at the [C]asino but denied being in the suspect auto at the time of the homicide." At one point during the interview, Wilson said that Foster shot Burks.

Wilson also stated during her interview that she did not have her cell phone at the time of Burks's murder. Wilson told the police that Foster had her phone at that time.

{¶ 51} Det. Hudson also testified that Wilson said that when Foster arrived at the house on E. 114th Street, she exited the house and got into his vehicle "[w]ith her belongings."

{¶ 52} Going back to the Burks murder, Det. Hudson testified at length about the location that Burks's body was found in relation to where the cartridge casing was found near her body. The prosecutor asked Det. Hudson "if it's true that the passenger [of the Nissan] was the person that fired the gun and if in fact the passenger had his [or her] arm out the window; does that all makes sense?" Det. Hudson answered, "Yes. Consistent with the shell casing where it is."

{¶ 53} Det. Hudson testified on cross-examination that he was "unclear" whether the person to whom the Escape was registered was related to Wilson.

### K. Wilson's Police Interview

{¶ 54} A video of Wilson's interview with the Cleveland police, which was conducted on December 20, 2021, was introduced into evidence. In this interview, Wilson stated the following pertinent to this appeal.

{¶ 55} In reference to the Burks murder, the police showed Wilson photographs of the Nissan taken from the Combined Video and told Wilson that Foster said Wilson shot someone. The police further told Wilson that Foster "was trying to put this on you." Wilson stated that she "couldn't tell you" what happened

to Burks, because she "wasn't there."  Wilson continued to tell the detectives that she "didn't believe ya'll.  I wasn't there."  Asked where she was, Wilson said, "I was at the [C]asino.  * * * I can't tell you what happened in that car."

{¶ 56} As to the Abrams murder, Wilson identified photographs of Armstrong and Abrams.  According to Wilson, Abrams was "a good friend" of hers.  The last time Wilson saw Abrams was "the day he was shot.  * * * The day [Foster] shot him."

{¶ 57} Wilson testified that she was at Abrams's house that day and "was trying to leave.  And [Abrams] would not let me leave.  And I was calling for a ride.  * * * But I could not call because of [Abrams].  He was fighting on me and s***."  According to Wilson, Abrams slapped her and threatened to kill her when she gave someone a piece of crack.  Wilson said that Abrams eventually let her leave when he "got the crack."  Wilson was trying to call "anyone to get me out of that hell hole."  Asked if she ever got through to anyone, Wilson replied, "No."

{¶ 58} Wilson and Abrams went outside.  According to Wilson, Foster "just showed up."  That's when "gunshots started going off."  Asked who had the gun, Wilson stated, "I don't know.  It was dark."  Wilson put her bags in Foster's car, and Foster and Wilson left the scene and went home to 5024 Scoville Avenue.

{¶ 59} Asked if Foster ever told her why he "went in there shooting," Wilson replied, "I don't know."

{¶ 60} The police changed the subject back to the Burks murder and again asked Wilson what happened.  She answered, "I don't know.  I was f***** up."

According to Wilson, Foster hit her on the ankle with a machete that day because she told him she did not want to be with him anymore.

{¶ 61} The police told her that cell-phone records put her at the scene of Burks's murder. Wilson told the police that she did not have her phone at that time. Eventually, Wilson told the police that Foster dropped her off at the Casino that night. Wilson went "joyriding" and was "doing a little crack." She then agreed with the police when they said someone picked her up from Foster's house and agreed with the police that Foster dropped her off at someone else's house. Asked again what happened that night, Wilson replied, "I don't know." Wilson then told the police that Foster shot Burks. Wilson maintained that she was not there and that Foster had her cell phone that night. "I was not in the car when any of this happened. * * * I did not do that."

## III. Law and Analysis

### A. Sufficiency of the Evidence and Manifest Weight of the Evidence

{¶ 62} "[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). The relevant inquiry is, "after viewing the evidence in the light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In essence, sufficiency is a test of adequacy. Whether the evidence is

legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 63} A manifest-weight-of-the-evidence challenge "addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387. Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 64} The Ohio Supreme Court has held that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *Jenks* at 272. "Since circumstantial evidence and direct evidence are indistinguishable so far as the * * * fact-finding function is concerned, all that is required of the [factfinder] is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Id.* "A conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991). This court had additionally held that "[p]hysical evidence is not

required to sustain a conviction against a manifest weight challenge." *State v. Flores-Santiago*, 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 37.

{¶ 65} In Wilson's first and second assignments of error, which challenge the sufficiency and manifest weight of the evidence, she argues that "there is zero physical evidence linking [her] to any of these crimes." Wilson does not specify on appeal which of her 17 convictions she is challenging. However, we surmise from her appellate brief that she is challenging her convictions for murdering and assaulting Burks and Abrams, as well as her convictions for assaulting Birdie and Armstrong.

{¶ 66} As to the Burks murder and assault, she — somewhat inconsistently — argues that "[t]he only physical link between [her] and the crimes is a statistical DNA match to swabs of Terry Foster's vehicle." Wilson further argues that she "cannot be placed in the vehicle at the time of the shooting." As to the Abrams murder and associated assaults, Wilson argues that she was "on-scene. But she told detectives that she informed Foster that Abrams struck her. Perhaps, angered by Abrams' actions, Foster committed the murder and assaults out of anger, without any knowledge of [Wilson] as to his forthcoming actions."

{¶ 67} Wilson was convicted of the following offenses pertinent to this appeal:

> Murder of Abrams in violation of R.C. 2903.02(A), which states that "[n]o person shall purposely cause the death of another * * *"; Murder of Abrams and Burks in violation of R.C. 2903.02(B), which states that "[n]o person shall cause the death of another as a proximate result of the offender's committing * * * an offense of violence that is a felony of

the first or second degree * * *"; and Felonious assault of Abrams, Burks, Birdie, and Armstrong in violation of R.C. 2903.11(A)(1) and (A)(2), which state that "[n]o person shall knowingly * * * [c]ause serious physical harm to another or * * * [c]ause * * * physical harm to another * * * by means of a deadly weapon * * *."

{¶ 68} Additionally, Wilson's conviction for the murder of Abrams is based on a complicity theory, i.e., that Wilson aided and abetted Foster when he shot and killed Abrams. Pursuant to R.C. 2923.03(A)(2), "No person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense * * *." The Ohio Supreme Court has held that

to support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

*State v. Johnson,* 93 Ohio St.3d 240, 245-246, 754 N.E.2d 796 (2001).

## B. The Abrams Murder and Assaults of Abrams, Birdie, and Armstrong

{¶ 69} First, we address the Abrams murder and the assaults of Abrams, Birdie, and Armstrong. Armstrong testified that, in the early morning hours of November 16, 2021, a male shot and killed Abrams and shot him. Armstrong further testified that Birdie was in the room when the gun was fired, and Birdie screamed. Armstrong also testified that Wilson and Abrams got into an argument immediately prior to the shooting, and Wilson left the house.

**{¶ 70}** Medical records establish that Birdie went to the hospital the next day with gunshot wounds to her left thigh and buttock. Birdie told the healthcare workers that she thinks she was shot the day before at 6:00 a.m.

**{¶ 71}** Agent Kunkle testified that there was a call from Wilson's phone to Foster's phone at 5:41 a.m. on November 16, 2021. There is no evidence of how long this call lasted or what, if anything, was said. Two calls were placed from Foster's phone to Wilson's phone at 5:46:04 a.m. and 5:46:16 a.m. Again, there is no evidence of how long these calls lasted or what, if anything, was said.

**{¶ 72}** The time of Abrams's death was not established, although Det. Lascko testified that he arrived at the scene at 7:53 a.m.

**{¶ 73}** Piscitello testified that the Combined Video showed the Nissan, which is registered to Foster, leave the area where Foster and Wilson lived at 5:33 a.m. and travel to the area where Abrams was murdered, arriving at 5:46 a.m. Furthermore, the Combined Video showed the Nissan leaving the area where Abrams was murdered at 5:50 a.m. and arriving back in the area where Foster and Wilson lived at 6:05 a.m.

**{¶ 74}** Kooser established that five 9 mm-fired cartridge casings and two 9 mm-bullet fragments were recovered from the scene of Abrams's murder. The bullet fragments were fired from the same pistol, and the cartridge casings were fired from the same pistol, although it could not be determined whether the bullet fragments and spent casings came from the same pistol.

{¶ 75} Wilson told police during her interview that she was at Abrams's house on November 16, 2021, and she and Abrams got into an argument. Abrams hit Wilson and threatened to kill her. Wilson tried to call for a ride, but never got through to anyone. She left the house and Foster was there. Gunshots were fired, but Wilson claimed to not know who fired them because it was dark. Wilson got into Foster's car, and she and Foster drove away.

{¶ 76} Upon review, we find that the state presented sufficient evidence that Wilson was complicit in the Abrams murder and the assaults of Abrams, Birdie, and Armstrong. Additionally, this is not the exceptional case in which the evidence weighs heavily against the conviction concerning the Abrams murder and the assaults of Birdie and Armstrong. Calls between Wilson's phone and Foster's phone occurred immediately prior to Foster killing Abrams and shooting Birdie and Armstrong. Immediately after the shooting spree, Wilson got into the Nissan with Foster and went the E. 46th Street area, where they lived. *See, e.g., State v. Hubbard*, 8th Dist. Cuyahoga No. 83389, 2004-Ohio-5204, ¶ 40 (affirming a murder conviction and stating that complicity "may be inferred from the circumstances surrounding the crime," including "presence, companionship and conduct before and after the offense is committed").

## C. The Burks Murder and Assaults

{¶ 77} Next, we turn to the murder and assault of Burks.

{¶ 78} Piscitello's and Det. Hudson's testimony, along with Combined Video, established that the Nissan left the E. 46th Street area at 3:16 a.m. on November 22,

2021, and arrived at the E. 79th Street and Central Avenue area at 3:19 a.m. Several cameras show the Nissan driving around the E. 79th Street area for the next few minutes. Burks is seen walking on E. 79th Street near Cedar Ave. at 3:20 a.m. By 3:22 a.m., she is out of camera range.

{¶ 79} The Combined Video then shows footage from a camera on the corner of E. 79th Street and Cedar Avenue. The camera zooms in to the far end of the street. What appear to be headlights of a car can be seen in the distance. The vehicle comes to a stop in the street. The headlights remain on, and the vehicle appears to be idle for approximately two minutes. The headlights turn off, and the car can be seen making a U-turn and driving away with the headlights off. One cannot tell from looking at this footage what car was stopped on the street, and no people or events other than a stopped car are visible.

{¶ 80} Another camera on E. 79th Street and Central Avenue shows the same events looking at the rear of the Nissan. From this angle, it is clear that the Nissan is the car driving on E. 79th Street. Once again, the camera zooms in to the far end of the street, which is where the Nissan stops. When the camera zooms, the video becomes grainy, but one can see a stopped car with the taillights on. A person approaches the Nissan and walks behind the car to the passenger side. As this happens, the Nissan's taillights are temporarily obscured. The video shows movement at the passenger side of the Nissan that appears to be a person falling to the ground. Then the Nissan drives out of camera range. Other cameras show the Nissan traveling in the opposite direction from E. 46th Street, where Foster and

Wilson live. The Nissan is seen as far east as E. 93rd Street and Marah Avenue at 4:00 a.m. and ultimately ends up back in the E. 46th Street area.

{¶ 81} Evidence presented at trial shows that the Escape left the E. 93rd Street area approximately 30 minutes after the Nissan was seen in the E. 93rd Street area. The Escape travels to the Casino. Wilson gets out of the Escape, goes into the Casino for four minutes, and gets back into the Escape. The Escape drives to E. 79th Street and passes the location of Burks's murder at 6:02 a.m.

{¶ 82} Evidence established that Burks's body was found on the sidewalk at 2232 E. 79th Street when the police responded to a call at 6:50 a.m. Forensic evidence established that the 9 mm spent-cartridge case found at the scene was fired from the same gun that was used to murder Abrams. Dr. Felo testified that Burks died from "one lethal gunshot wound" to the chest. Forensic evidence also established that Wilson's DNA was found on the Nissan's interior passenger-side door. Wilson's DNA, as well as Foster's DNA, was found on the driver's-side interior of the Nissan. Foster's DNA was not found on the interior passenger-side of the Nissan.

{¶ 83} Agent Kunkle testified that a call was placed from Foster's phone at 3:37 a.m., and Foster's phone used a tower in the "Woodland Hills, Buckeye, Shaker area." A second call was placed from Foster's phone at 3:38 a.m. using the same tower. This call was placed to Wilson's phone, which was in the E. 46th Street area at the time.

{¶ 84} Kooser testified that a shell casing should fall to the right of a semiautomatic gun after it is fired. According to Kooser, if a gun is fired from the driver's seat of a car past the passenger seat and out through the passenger window, the casing should fall inside of the car, although it is possible that it would ricochet and go out the window.

{¶ 85} Det. Hudson's testimony is consistent with the Combined Video and the testimony regarding Wilson's and Foster's cell phones. Det. Hudson further testified that the location where the shell casing was found near Burks's body is consistent with someone firing a gun out of the passenger-side window of a car.

{¶ 86} In her interview with police, Wilson denied being in the Nissan at the time Burks was shot and killed. She claimed to be at the Casino. Video evidence shows that Wilson went to the Casino; however, she got out of the Escape at 4:38 a.m. and entered the Casino at 4:43 a.m., which is over one hour after 3:26 a.m. when the state asserts that Burks was killed.

{¶ 87} Upon review of the evidence in the record, we find that Wilson's convictions for the murder of Burks in violation of R.C. 2903.02(B), and two counts of assaulting Burks in violation of R.C. 2903.11(A)(1) and (2), are not supported by sufficient evidence in the record. Particularly, we find insufficient evidence to show that Wilson was in the Nissan at the time of Burks's murder and that Wilson was the person who shot and killed Burks.

{¶ 88} The evidence is sufficient to establish that the Nissan stopped on E. 79th Street and encountered Burks as she was walking in the street. The evidence

further shows that Burks fell to the ground, and the Nissan drove away. Approximately three-and-a-half hours later, police found Burks's body, killed by a single gunshot wound, on the ground in the same location. Testimony and evidence established that this scenario is consistent with someone, possibly from the passenger seat of the Nissan, shooting and killing Burks.

{¶ 89} Wilson's DNA was found in the Nissan on both the driver's and passenger's sides. However, the only evidence concerning *when* Wilson was in the Nissan is testimony that she got into the car on November 16, 2021 — five days before Burks's murder — after Foster killed Abrams. The evidence is undisputed that the Nissan's windows are tinted dark enough that one cannot on the Combined Video see who was in the vehicle on November 22, 2021. The Nissan is registered to Foster, but there is no evidence that Wilson was in the car at the time of Burks's murder. A call was placed from Foster's phone to Wilson's phone at 3:38 a.m., which is approximately 12 minutes after Burks was murdered. The two phones pinged off of different cell phone towers, with Foster's phone being in the "Buckeye Shaker area," and Wilson's phone being in the E. 46th Street area. There is no evidence that Wilson's phone was in the E. 79th Street area at the time Burks was murdered.

> Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime. This truism is reflected in the state's constitutional burden to prove the guilt of "the accused" beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Like any fact, the state can prove the identity of the accused by "circumstantial or direct" evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991). The relevant question in a sufficiency-of-the-evidence review is whether, "after viewing the evidence in a light most favorable to the prosecution,

any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, at paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, ¶ 15.

{¶ 90} In the case at hand, circumstantial evidence established that someone in the Nissan may have shot and killed Burks. However, based on the evidence presented at trial, the trier of fact must speculate that Wilson was in the Nissan on the night in question, and then must further speculate that Wilson was the person who killed Burks. "Proof beyond a reasonable doubt cannot be based on conjecture, speculation or an assessment of the likelihood of various possibilities." *State v. Hicks,* 8th Dist. Cuyahoga No. 102206, 2015-Ohio-4978, ¶ 57. "Proof beyond a reasonable doubt is not a mere probability or even a strong probability. It requires a fact finder to be 'firmly convinced' of the truth of a fact, i.e., 'proof of such a character than an ordinary person would be willing to rely and act upon it in the most important of [his or her] own affairs.' R.C. 2901.05(E); *State v. Givens*, 2d Dist. Clark No. 2005-CA-42, 2005-Ohio-6670, ¶ 11." *Id.*

{¶ 91} In *Hicks*, this court found insufficient evidence of prior calculation and design concerning the defendant's conviction for aggravated murder. *Id.* at ¶ 58. "Based upon the evidence presented, too much is unknown about the moments leading up to and the circumstances surrounding [the victim's] death for the jury to do anything more than speculate as to whether Hicks" planned the murder or the murder was spontaneous. *Id.* *See also Hurt v. Charles J. Rogers*

*Transp. Co.,* 164 Ohio St. 329, 332-333, 130 N.E.2d 820 (1955) ("[W]here a court seeks to apply the rule forbidding the basing of one inference upon another, the principle involved is that an inference cannot be based upon evidence that is too uncertain or speculative or which raises merely a conjecture or possibility.").

{¶ 92} Accordingly, Wilson's second assignment of error is sustained as to the murder and assault convictions concerning Burks, and it is overruled as to the remaining counts. Wilson's first assignment of error is overruled, in toto. Wilson's third assignment of error, concerning her consecutive sentences, is made moot by the disposition of her second assignment of error.

{¶ 93} Wilson's convictions and sentence for the murder of Burks in violation of R.C. 2903.02(B) and the assaults of Burks in violation of R.C. 2903.11(A)(1) and (2) are vacated. Wilson's remaining convictions are affirmed. This case is remanded to the trial court for resentencing consistent with this opinion.

{¶ 94} Judgment affirmed in part and vacated in part. The case is remanded to the lower court for further proceedings consistent with this opinion.

It is ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

EILEEN A. GALLAGHER, P.J., and
ANITA LASTER MAYS, J., CONCUR